**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **TRI COUNTY WHOLESALE** | : | |
| **DISTRIBUTORS, INC., et al.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Case No. 2:13-CV-317** |
| **v.** | : | |
| | : | |
| **LABATT USA OPERATING CO., LLC,** | : | **JUDGE ALGENON L. MARBLEY** |
| **et al.,** | : | |
| | : | **Magistrate Judge Deavers** |
| **Defendants.** | : | |
| | : | |

## OPINION & ORDER

## I. INTRODUCTION

This matter is before the Court on the Motion of Plaintiffs Tri County Wholesale

Distributors, Inc. ("Tri County") and the Bellas Company d/b/a Iron City Distributing ("Iron

City") (collectively "Plaintiffs" or the "Distributors") for Preliminary Injunction. (Doc. 9.) For

the reasons stated below, Plaintiff's Motion is **GRANTED**.

## II. BACKGROUND

### *A. Factual Background*

This action arises out of the purported termination of beer and flavored malt beverage

distribution contracts. Plaintiffs Tri County and Iron City are Ohio distributors of alcoholic

beverages. They possess franchise relationships with several manufacturers, including

Defendant Labatt USA Operating Co., LLC ("Labatt USA Operating"). As an entity that supplies

alcoholic beverages to distributors in Ohio, Labatt USA Operating is a "manufacturer" of beer

and flavored malt beverages, as that term is defined in Ohio Rev. Code § 1333.82(B). Stip. ¶ 7.[1]

### 1. Tri County and Iron City Distribution Contracts

Tri County and Iron City entered into written distribution agreements with Labatt USA

Operating in 2010 and 2011, respectively.  Stip. ¶¶ 8, 10; *see* P Ex. 1, Doc. 47-1, *Labatt USA*

*Operating Co., LLC Distribution Agreement dated July 1, 2010* ("*Tri-County Contract*"); P Ex.

2, Doc. 47-2, *Labatt USA Operating Co., LLC Distribution Agreement dated June 28, 2011*

("*Iron City Contract*") (collectively, the "Distribution Contracts"). The Distributors allege that

the Distribution Contracts provide them with an exclusive and indefinite right to distribute

certain brands of beer and alcohol (the "Specified Brands") in their respective territories. *See Tri-*

*County Contract* §§ 1.0, 2.0; *Iron City Contract* §§ 1.0, 2.0. Each Distribution Contract

purportedly limits the reasons for which Labatt USA Operating may terminate the Distributor.

*See Tri County Contract* §§ 6.0-6.5; *Iron City Contract* §§ 6.0-6.5.

In 2012, the brands supplied by Labatt USA Operating constituted approximately 25% of

Tri County's overall sales.  Stip. ¶ 9; P. Ex. 26.  In 2012, the brands supplied by Labatt USA

Operating made up approximately 8% of Iron City's overall sales.  Stip. ¶ 11; P. Ex. 27.

### 2. Divestment of the Labatt Brands and Labatt Corporate Structure

Prior to 2008, the Labatt family of brands was imported into the United States by InBev

USA, LILAC. ("InBev USA"), which was a subsidiary of InBev NV./S.A. ("InBev").  Stip. ¶ 28.

In July 2008, InBev contracted to acquire Anheuser-Busch Companies, Inc.  In November 2008,

the U.S. Justice Department filed a civil antitrust complaint against InBev and Anheuser-Busch

---

[1] This refers to the parties' stipulations of fact in connection with Plaintiffs' motion for preliminary injunction, which, by agreement of the parties, are not to be used for any purpose other than resolution of Plaintiffs' preliminary injunction motion.  (*See* Stipulation, Doc. 47, 1.)

in the U.S. District Court for the District of Columbia.[2]  *Id.* at ¶ 29. InBev agreed to settle the case, and the district court entered a Final Judgment that required InBev to divest InBev USA and grant a perpetual license to the acquirer to brew and sell Labatt brand beer for consumption in the United States. *Id.* at ¶ 30; *Memorandum Order*, D. Ex. 2; *Response to Public Comments on the Proposed Final Judgment*, D. Ex. 5, Doc. 47-15.

In 2009, pursuant to the Final Judgment, the newly-formed Labatt USA Operating purchased specified assets of InBev USA. Stip. ¶ 31; D. Ex. 17.  In connection with the sale, Labatt USA Operating acquired the sub-license for all of the trademarks and beer recipes for the Labatt family of brands in the United States.[3]  Labatt USA Operating does not own or operate brewing assets and does not brew any alcoholic beverages. Stip. ¶ 25.  Rather, pursuant to a contract between Labatt USA Operating and Molson Canada 2005 ("Molson"), Molson manufactures Labatt and Labatt Blue Light in Canada.[4]  *Id.* at ¶ 24. High Falls Operating manufactures all other Specified Brands, including the Labatt family of brands other than Labatt Blue and Labatt Blue Light, Genesee, Seagram's, Honey Lager, and the Dundee family of brands.  *Id.* at ¶¶ 24, 36.

Labatt USA Operating has a current Supplier Registration Certificate issued by the State of Ohio Division of Liquor Control.  *Id.* at ¶ 26; P. Ex. 4.  In addition, from time to time, Labatt

---

[2] The case was captioned *United States of America v. InBev N.V./S.A.*, Case No. 08-cv-1965.

[3] Specifically, in connection with the sale of InBev USA's assets to Labatt USA Operating, Labatt Brewing Company Limited transferred to a special purpose vehicle ("SPV"), Ontario, Inc., all of the trademarks and the beer recipes for the Labatt family of brands in the United States.  In March 2009, Labatt Brewing Company Limited and Ontario, Inc. entered into a license agreement with Labatt USA Licensing Co., LLC. ("Labatt USA Licensing"). Stip. ¶ 32; P. Ex. 10. Subsequently, in November 2010, Labatt USA Licensing entered into a sub-license agreement, entitled *Amended and Restated Affiliate License Agreement (Labatt)*, with Labatt USA Operating. Stip. ¶ 33; P. Ex. 11.

[4] In August 2010, Labatt USA Operating entered into an agreement with Molson Canada 2005 ("Molson"), a Canadian company, pursuant to which Molson would produce Labatt Blue and Labatt Blue Light products to be imported into the United States and supplied by Labatt USA Operating to distributors in Ohio and other states (the "*Molson Canada Supply Agreement*").  As a part of the *Molson Canada Supply Agreement*, Labatt USA Operating granted a sub-sub-license to Molson.  Prior to the *Molson Canada Supply Agreement*, Labatt Canada had produced the Labatt Blue and Labatt Blue Light products for sale in the United States by Labatt USA Operating. Stip. ¶ 34.

USA Operating has filed with the State of Ohio Division of Liquor Control certain Territory Designation Forms relating to the brands supplied by Labatt USA Operating to distributors.  Stip. ¶ 27; P. Ex. 5.

Labatt USA Operating, as well as all sub-licensees of the Specified Brands except for Molson, are indirectly wholly owned by Defendant North American Breweries Holdings, LLC ("NAB Holdings").  Stip. ¶ 19.  Prior to December 11, 2012, all membership interests in NAB Holdings were owned by three entities: 1) KPS Special Situations Fund III, LP; 2) KPS Special Situations Fund III (A), LP; and 3) KPS Capital Partners[5] (collectively "KPS" or the "KPS entitites").  *Id.* at ¶¶ 17, 20; *KPS Ownership Chart*, D. Ex. 1. KPS therefore controlled the rights to distribute the Specified Brands in the United States.

By a Unit Purchase Agreement dated October 25, 2012, Defendant Cerveceria Costa Rica, S.A. ("CCR"), through its affiliate CCR Breweries, Inc., contracted to buy 100% of the membership interests in NAB Holdings from the KPS entities (the "KPS/CCR Transaction"). Stip. ¶ 22; P. Ex. 8.  The KPS/CCR Transaction closed on December 11, 2012.  On the closing date, KPS transferred all of its interests in NAB Holdings – including the accompanying distribution rights – to CCR or one of its affiliates.  Stip. ¶¶ 18, 22; P. Exs. 8, 9.  As part of the KPS/CCR Transaction, CCR Breweries, Inc. was merged into NAB Holdings with NAB Holdings being the surviving entity, resulting in CCR American Breweries, Inc. owning 100% of NAB Holding's membership interests.  *Id.*; P. Ex. 9. From December 11, 2012 to the present, CCR American Breweries, Inc. has been owned 100% by CCR. Stip. ¶ 23.

---

[5] KPS Capital Partners include Richard Lozyniak, James Pendegraft, Kenneth Yartz, Peter Bodenham, Jeff Cardell, Sandy Ford, and Mark Minunni.

Below the level of NAB Holdings, the various operating and licensing entities retained the same corporate structure they had prior to the KPS/CCR Transaction. [6]  Stip. ¶ 19; *compare KPS Ownership Chart*, D. Ex. 1., *with CCR Ownership Chart*, P. Ex. 3. Following the KPS/CCR Transaction, the Distributors continued to order the Specified Brands from Labatt USA Operating, and the Specified Brands continued to be invoiced to the Distributors by Labatt USA Operating.

### 3. Purported Distribution Contract Terminations

On March 7 and March 11, 2013, Iron City received letters from CCR purporting to terminate the Distribution Contract between Iron City and Labatt USA Operating.  Stip. ¶ 13; *see Iron City Termination Letter*, P. Ex 21.  On March 11, 2013, Tri County received a letter from CCR purporting to terminate the Distribution Contract between Tri County and Labatt USA Operating.  Stip. ¶ 12; *see Tri County Termination Letter*, P. Ex. 22. The sole basis on which

---

[6] The parties stipulate that, prior to and after December 11, 2012, the following were and continue to be true:

  a. Defendant Labatt USA Operating has been owned 100% by Labatt USA Operating Holdings, LLC.
  b. High Falls Operating Company ("High Falls Operating") has been owned 100% by High Falls Operating Holdings, LLC.
  c. Labatt USA Operating Holdings, LLC and High Falls Operating Holdings, LLC have both been owned 100% by North American Breweries Operating Holdco, LLC.
  d. North American Breweries Operating Holdco, LLC has been owned 100% by NAB Holdco, LLC.
  e. North American Breweries Licensing Holdco, LLC has been owned 100% by NAB Holdco, LLC.
  f. NAB Holdco, LLC has also owned 1 share of the 1,000 outstanding shares (0.1%) of 1793161 Ontario, Inc. ("Ontario, Inc."), a Canadian entity.  The other 999 shares of Ontario, Inc. (99.9%) are owned by Labatt Brewing Company Limited, a Canadian entity unaffiliated with Defendants.
  g. NAB Holdco, LLC has been owned 100% by North American Breweries, Inc.
  h. North American Breweries, Inc. has been owned 100% by North American Breweries Intermediate Holdings, LLC.
  i. North American Breweries Intermediate Holdings, LLC has been owned 100% by Defendant NAB Holdings.
  j. High Falls Licensing Co., LLC has been owned 100% by High Falls Licensing Holdings, LLC.
  k. Labatt USA Licensing Co., LLC has been owned 100% by Labatt USA Licensing Holdings, LLC.
  l. High Falls Licensing Holdings, LLC and Labatt USA Licensing Holdings, LLC are both 100% owned by North American Breweries Licensing Holdco, LLC.

Stip. ¶ 19.

Defendants rely to terminate the Distributors' distribution rights is the successor manufacturer provision of Ohio Rev. Code §1333.85(D).  Stip. ¶ 14.

Both termination letters stated: "[W]e hope, as a wholesaler with many years in the industry, you can appreciate that our decision was difficult, but necessary, in order for our company to remain competitive in the market." *Iron City Termination Letter* at 1; *Tri County Termination Letter* at 1. The termination letters do not reference any breach of the Distribution Contracts or violation of state law by the Distributors, or any of the specified grounds for termination referenced under Section 6.0 of the Distribution Contracts. *Id.*  Neither of the Distributors has consented to termination of its franchise. Stip. ¶ 15.

If Defendants are permitted to terminate Distributors' rights to distribute the brands supplied by Labatt USA Operating in Distributors' respective territories, Labatt USA Operating will designate Superior Beverage Company as the distributor for the same brands currently distributed by Distributors for the same territories currently served by Distributors.  Stip. ¶ 16.

*B. Procedural History*

Plaintiffs filed a breach of contract action against Defendants.  (Doc. 1.) Plaintiffs also seek a declaratory judgment that Defendants may not terminate their existing distribution franchises with Labatt pursuant to O.R.C. § 1333.85(D), or in the alternative, declaratory judgment that O.R.C. § 1333.85(D) so-applied would constitute an unconstitutional taking. Finally, Plaintiffs assert claims for certain compensatory payments described in O.R.C. § 1333.851.

Plaintiffs subsequently moved for a preliminary injunction to enjoin Defendants from terminating their distribution rights with respect to the Specified Brands.  (Doc. 9.)  Plaintiffs also requested that this Court authorize limited expedited discovery to enable the parties to

prepare adequately for an injunction hearing. (Doc. 11.) This Court subsequently granted

expedited discovery as to matters relating to the pending motion for preliminary injunction.  A

preliminary injunction hearing was held at which counsel for all parties appeared.  This matter is

ripe for review.

### III. STANDARD OF REVIEW

A preliminary injunction is a remedy used by the court to preserve the status quo between

the parties pending trial on the merits. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

When determining whether to grant a preliminary injunction, this Court must balance the

following four factors: "(1) whether the movant has shown a strong likelihood of success on the

merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3)

whether the issuance of the injunction would cause substantial harm to others; and (4) whether

the public interest would be served by issuing the injunction." *Overstreet v. Lexington-Fayette*

*Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). These factors are to be balanced against

one another other and should not be considered prerequisites to the grant of a preliminary

injunction. *United Food & Commercial WorkersUnion, Local 1099 v. Sw. Ohio Reg'l Transit*

*Auth.*, 163 F.3d 341, 347 (6th Cir. 1998). As an extraordinary remedy, a preliminary injunction is

to be granted only if the movant carries his or her burden of proving that the circumstances

clearly demand it. *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).

Significantly, "[a]t the preliminary injunction stage, 'a plaintiff must show more than a

mere possibility of success,' but need not 'prove his case in full.'" *Northeast Ohio Coalition v.*

*Husted*, 696 F.3d 580, 591 (6th Cir. 2012) (quoting *Certified Restoration Dry Cleaning Network,*

*LLC v. Tenke Corp.,* 511 F.3d 535, 543 (6th Cir. 1997) (citations omitted)). Furthermore, "it is

ordinarily sufficient if the plaintiff has raised questions going to the merits so serious,

substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Id*. (alterations original) (quoting *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.,* 119 F.3d 393, 402 (6th Cir. 1997)).

## IV. LAW & ANALYSIS

### A. *Likelihood of Success on the Merits*

The Distributors argue that CCR's termination of their franchise agreement violates the Ohio Alcoholic Beverage Franchise Act (the "Franchise Act"), O.R.C. §§ 1333.82-87. The Franchise Act provides generally that "no manufacturer or distributor shall cancel or fail to renew a franchise…for other than just cause and without at least sixty days' written notice." O.R.C. § 1333.85. Under the statute, "[a] unilateral alteration of the franchise by a manufacturer for a reason unrelated to any breach of the franchise or violation of sections 1333.82 to 1333.86 of the Revised Code by the distributor shall not constitute just cause for cancellation of or failure to renew a franchise." O.R.C. § 1333.85(B)(3). The Sixth Circuit, in an unpublished opinion, *Tri-County Wholesale Distributors v. The Wine Group, Inc*., No. 10-4202, 2012 WL 2478357 (6th Cir. June 29, 2012), reviewed a preliminary injunction that enjoined a manufacturer from terminating a distribution franchise for business reasons alone. In predicting how the Ohio Supreme Court would apply O.R.C. § 1333.85, the Sixth Circuit concluded that the distributor had a "near certainty" of success on the merits where the termination reflected "a manufacturer's unilateral determination that it could make more money if the franchise were terminated," *id*. at *4 (quoting *Dayton Heidelberg Distributing Co. v. Vintners International Co. of New York*, No. C-3-87-436, 1991 WL 1119912, at *8 (S.D. Ohio Apr. 8, 1991)), and "the Termination Notices do not suggest any breach [of the franchise agreement] or statutory violations." *Id.* at *5-6 (citing *Vintners*, 1991 WL 1119912, at *9).

8

Defendants here do not allege that Plaintiffs breached their contracts or violated the Franchise Act in such a way as to provide just cause for the termination their franchises. *See* Stip. ¶ 16. Rather, they rely on O.R.C. § 1333.85(D), which permits a "successor manufacturer" to terminate a franchise, other than for cause, under certain circumstances. O.R.C. § 1333.85(D).

Specifically, O.R.C. § 1333.85(D) provides:

If a successor manufacturer acquires all or substantially all of the stock or assets of another manufacturer through merger or acquisition or acquires or is the assignee of a particular product or brand of alcoholic beverage from another manufacturer, the successor manufacturer, within ninety days of the date of the merger, acquisition, purchase, or assignment, may give written notice of termination, nonrenewal, or renewal of the franchise to a distributor of the acquired product or brand. Any notice of termination or nonrenewal of the franchise to a distributor of the acquired product or brand shall be received at the distributor's principal place of business within the ninety-day period. If notice is not received within this ninety-day period, a franchise relationship is established between the parties. If the successor manufacturer complies with the provisions of this division, just cause or consent of the distributor shall not be required for the termination or nonrenewal.

The Distributors argue that O.R.C. § 1333.85(D) does not apply to this case for four reasons. First, they argue that CCR is not a "successor manufacturer" under the meaning of O.R.C. § 1333.85(D). Second, Plaintiffs contend that that they have existing, enforceable contracts with Labatt, and Labatt has no basis under those contracts to terminate Distributors. Third, they argue that § 1333.85(D) only applies where written contract survives the transfer of ownership rights. Finally, Plaintiffs contend that Defendants' interpretation of §1333.85(D) would violate the Ohio and United States Constitutions because it would operate as an unlawful taking of property that is not for a public use. The Court considers these arguments *seriatim*.

## 1. Whether CCR is a "Successor Manufacturer"

As discussed above, the Franchise Act authorizes permits a "successor manufacturer" to terminate a franchise, other than for cause, under certain circumstances. O.R.C. § 1333.85(D).

9

Although the Franchise Act defines the term "manufacturer," *see* O.R.C. § 1333.82(B), it does not define the term "successor manufacturer." *Hill Distrib. Co. v. St. Killian Importing Co.*, No. 2:11-cv-709, 2011 WL 3957255, *2 (S.D. Ohio Sept. 7, 2011).  Thus, courts have been tasked with determining what the legislature meant when it used this term. *InBev USA LLC v. Hill Distributing Co*., No. 2:05–cv–00298, 2006 WL 6924045, at *5 (April 3, 2006 S.D. Ohio). As this Court has explained, because "[t]he language of § 1333.85 is not entirely clear and unambiguous," *id*., "subsection (D) cannot be read in isolation, but must be considered in the context of the statute as a whole." *St. Killian*, 2011 WL 3957255, at *2 (citing *InBev USA*, 2006 WL 6924045, at *5).

Specifically, this Court has explained that "the prohibitions found in § 1333.85(B) are instructive with respect to the legislature's intent to prohibit certain conduct and its understanding of the term 'successor manufacturer.'" *InBev USA*, 2006 WL 6924045, at *6. As such, "an entity can only qualify as a 'successor manufacturer' under subsection (D) if one of the situations in subsection (B) does not apply." *St. Killian*, 2011 WL 3957255, at *3 (citing *InBev USA*, 2006 WL 6924045). There are four situations that, under § 1333.85(B), "never constitute just cause and preclude the application of (D)": (1) failure of a party to take action that would result in a violation of federal or state law; (2) restructuring, other than in bankruptcy, of a manufacturer's business; (3) unilateral alteration of the franchise by a manufacturer for a reason unrelated to any breach of the franchise or violation of R.C. §§ 1333.82 and 1333.86; and (4) "a manufacturer's sale, assignment, or other transfer of the manufacturer's product or brand to another manufacturer over which it exercises control." *St. Killian*, 2011 WL 3957255, at *3; O.R.C. § 1333.85(B).

Here, subsection (B)(1) does not apply because there is no allegation that Defendants seek to terminate Distributors for refusing to take action that would result in a violation of

federal or state law. Subsection (B)(3) has been interpreted by courts to prohibit the unilateral termination of a franchise for business reasons, where there has been no breach of the franchise agreement or violation of state law. *See The Wine Group*, 2012 WL 2478357, at *4 (citing *Vintners*, 1991 WL 1119912, at *8). As discussed above, however, subsection (D) creates an exception to this general rule for "successor manufacturers." Nor does the language of subsection (B)(3) does shed any light on the types of transactions to which the "successor manufacturer" exception applies.

In contrast, the situations described in subsections (B)(2) and/or (B)(4) do present concrete fact patterns that can be contrasted with a "successor manufacturer" transaction. *See InBev USA*, 2006 WL 6924045, at *6 (subsection (D) does not apply where transaction is a restructuring under subsection (B)(2)); *St. Killian*, 2011 WL 3957255, at *3 (same); *Beverage Distributors, Inc. v. Miller Brewing Company,* 803 F.Supp.2d 765 (S.D. Ohio 2011) (subsection (D) does not apply where transaction falls under subsection (B)(4) because brewers continued to exercise control over brands after merger).  The Court will examine whether the facts of the KPS/CCR Transaction fall within the scope of either subsection (B)(2) or subsection (B)(4).

Subsection (B)(2) applies to the restructuring, other than in bankruptcy, of a manufacturer's business.  This Court has explained that, "[w]hile the statutory term 'restructure' is not defined, its common meaning is 'to give a new structure or organization to.'"  *InBev USA*, 2006 WL 6924045, at *6 (quoting *Webster's Third New International Dictionary,* Merriam–Webster Inc. (1981)).  To determine whether subsection (B)(2) applies to CCR's acquisition of all membership interests in NAB Holdings, the Court looks to other circumstances that have been deemed to constitute "restructuring."

11

In *InBev USA LLC v. Hill Distributing Co.*, No. 2:05–cv–00298, 2006 WL 6924045 (April 3, 2006 S.D. Ohio), this Court considered a transaction in which brewer/importers Labatt USA, Beck's North America, and various holding companies were merged into Latrobe Brewing Company, which was renamed InBev USA. *Id.* at *2. After the merger, Latrobe/InBev USA sought to simplify its United States distribution networks by terminating franchise agreements held by Ohio distributors of Labatt USA and Beck's North America. *Id.* at *3. The Court found that "[n]o assets, liabilities, products, or brands were transferred to any new ownership group." *Id.* at *6. Moreover, the Court found that the "realit[y] of the transaction" was that Labatt and Beck's North America were not "eliminated" by the merger because those companies "were, and their brands still are, a part of the same business organization." *Id.* The Court therefore held that, "[b]ecause no consideration was paid, no products changed ownership control, and this restructuring took place outside a bankruptcy proceeding, InBev USA's actions fit squarely within the conduct prohibited under § 1333.85(B)(2)." *Id.* Given that §1333.85(B) prevented the termination of the Ohio franchise agreements, InBev could not terminate those agreements under § 1333.85(D). In contrast, the Court explained, "[t]he Franchise Act permits termination of franchise agreements …when there is a change in ownership and control of brands through an arms-length merger or acquisition." *Id.* at *7.

Similarly, in *Hill Distrib. Co. v. St. Killian Importing Co.*, No. 2:11-cv-709, 2011 WL 3957255 (S.D. Ohio Sept. 7, 2011), this Court considered a transaction in which brewer Carlsberg sold to St. Killian the right to import its brands into the United States. *Id.* at *1. Applying the rule of *InBev USA*, the Court determined that this transaction too was merely a "restructuring of Carlsberg's importation arrangement" because – though the brands now had a different importer – Carlsberg's "ownership and control of the Brands … never wavered." *Id.* at

12

*3.  In particular, the Court pointed out that Carlsberg "continue[d] to brew the beers, own the intellectual property, and approve the marketing campaigns" and retained the rights to "terminate St. Killian under various circumstances and obtain a new importer." *Id*. Although the Court recognized that St. Killian actually "bought the rights to import the Brands," the Court found this distinction with *InBev USA* unpersuasive because "Carlsberg had to approve of St. Killian as its new importer" and thus "continued to maintain control over its Brands." *Id*. at *4.

Here, in an arms-length transaction, CCR paid KPS a substantial sum to purchase 100% of the membership interests in NAB Holdings – the entity that directly or indirectly owns and controls Labatt USA Operating, as well as all sub-licensees of the Specified Brands except for Molson.  Stip. ¶ 19. Following the KPS/CCR Transaction, KPS had no interest in the Specified Brands. Thus, in contrast to *InBev USA*, consideration was paid and "assets, liabilities, products, or brands were transferred to [a] new ownership group." *InBev USA*, 2006 WL 6924045, at *6. Moreover, unlike the transaction at issue in *St. Killian*, the KPS/CCR Transaction changed the "ownership and control of the Brands." *St. Killian*, 2011 WL 3957255, at *3.  In fact, the acquisition of interests in NAB Holdings was the only structural change effected by the KPS/CCR Transaction: below the level of NAB Holdings, the various operating and licensing entities retained the same corporate structure they had prior to December 11, 2012.[7] Stip. ¶ 19; *compare KPS Ownership Chart*, D. Ex. 1., *with CCR Ownership Chart*, P. Ex. 3.  Thus, the KPS/CCR Transaction did not simply "give a new structure or organization to" the entities at issue, *InBev USA*, 2006 WL 6924045, at *6, but instead replaced the entity at the top of the organizational chart.  Accordingly, the KPS/CCR Transaction is not properly considered a "restructuring" governed by § 1333.85(B)(2).

---

[7] *See supra* n.7.

Subsection (B)(4) concerns "a manufacturer's sale, assignment, or other transfer of the manufacturer's product or brand to another manufacturer over which it exercises control." O.R.C. § 1333.85(B)(4).  Although the Franchise Act itself does not define the term "exercises control," this Court has explained that another Ohio statute – O.R.C. 1704 – "defines the term 'control' in the context of the law governing corporations" to mean "possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the exercise of or the ability to exercise voting power, by contract, or otherwise." *Beverage Distributors,* 803 F.Supp.2d at 775-776 (quoting O.R.C. § 1704.01(C)(6)).  Similarly, Black's Law Dictionary defines "control" as "[t]he direct or indirect power to govern the management and policies of a person or entity, whether through ownership of voting securities, by contract, or otherwise; the power or authority to manage, direct, or oversee <the principal exercised control over the agent> [sic]." *Id.* at 776 (quoting Bryan A. Garner, Black's Law Dictionary (9th ed. 2009)).  This Court therefore predicted that, if faced with the issue, the Supreme Court of Ohio would apply a definition of "exercises control" that is consistent with these sources. *Id.* at 777.

Here, the KPS/CCR Transaction resulted in the sale and transfer of 100% of the membership interests in NAB Holdings from the KPS entities to the CCR-owned entity CCR American Breweries, Inc. As such, it is undisputed that the KPS entities no longer have any "direct or indirect power to govern the management and policies of" NAB Holdings or any of its subsidiaries, including Labatt USA Operating, its sub-licensees, and sub-contractors.  Moreover, pursuant to the 2009 settlement of Anheuser-Busch/InBev anti-trust suit and the Final Judgment, InBev has entirely and irrevocably divested itself of any interest in Labatt assets in the United States.  Stip. ¶ 30; *Memorandum Order*, D. Ex. 2; *Response to Public Comments on the*

14

*Proposed Final Judgment*, D. Ex. 5, Doc. 47-15.  Accordingly, there can be no argument that Anheuser-Busch/InBev retains any control of the Specified Brands. The KPS/CCR Transaction cannot be viewed as merely a "transfer of the manufacturer's product or brand to another manufacturer over which [the previous manufacturer] exercises control." O.R.C. § 1333.85(B)(4).  The KPS/CCR Transaction therefore does not fall within the scope of subsection (B)(4).

Having determined that the KPS/CCR Transaction was not a "restructuring" pursuant to subsection (B)(2) or a transfer to a commonly-controlled entity pursuant to subsection (B)(4), the Court now examines whether CCR otherwise qualifies as a "successor manufacturer." Subsection (D) defeines a "successor manufacturer" transaction as one whereby a new entity "acquires all or substantially all of the stock or assets of another manufacturer through merger or acquisition or acquires or is the assignee of a particular product or brand of alcoholic beverage from another manufacturer."  O.R.C. § 1333.85(D).  Here, CCR, through its affiliate CCR Brewing, Inc., "acquire[d] all …. of the stock or assets" of NAB Holdings "through merger or acquisition." On the face of the transaction, CCR qualifies as a "successor manufacture" for the purposes of O.R.C. § 1333.85(D).

Plaintiffs argue that CCR cannot be a "successor manufacturer" because the entity acquired through the KPS/CCR Transaction – NAB Holdings – was not itself a "manufacturer" as that term is defined in O.R.C. § 1333.82(B).  Indeed, the parties stipulate that Labatt USA Operating is the relevant "manufacturer" under the Franchise Act, because that entity supplies alcoholic beverages to distributors in Ohio, has a current Supplier Registration Certificate issued by the State of Ohio Division of Liquor Control, and files with the state Territory Designation Forms relating to the Specified Brands. Stips. ¶¶ 7, 26-27.  Plaintiffs' argument ignores that, in

acquiring NAB Holdings, CCR acquired 100% of the membership interests in the entity that indirectly owns 100% of Labatt USA Operating. *See* Stip. ¶ 19.  Thus, CCR did, indirectly, acquire "all of the stock" in Labatt USA Operating.

Moreover, pursuant to subsections (B)(2) and (B)(4) of the Franchise Act, if Labatt USA Operating had been sold or transferred to another entity over which NAB Holdings exercised control, that entity would not be able to avail itself of the "successor manufacturer" provisions of subsection (D).  *See InBev USA*, 2006 WL 6924045, at *6; *St. Killian*, 2011 WL 3957255, at *3; *Beverage Distributors,* 803 F.Supp.2d at 776-77.  As such, the relevant inquiry for the purposes of subsection (D) is whether there has been a change, through acquisition or merger, in the entity that exercises ultimate control over the brands at issue.  That question is answered in the affirmative: in purchasing 100% of the membership interests in NAB Holdings, CCR did acquire complete control over the Specified Brands.

Based on the above, the Court finds that Plaintiffs are unlikely to succeed on the merits of their argument that CCR is not a "successor manufacturer" for the purposes of O.R.C. § 1333.85(D).

### 2. Whether Contracts Preclude Termination Under § 1335.85(D)

The Distributors also argue that, even if CCR is a "successor manufacturer" under the meaning of O.R.C. § 1333.85(D), the Distribution Contracts at issue preclude CCR from terminating their franchises on that basis.  Specifically, Plaintiffs assert the Distribution Contracts extend for an indefinite term and can only be terminated by the manufacturer upon a material breach or the occurrence of one of enumerated grounds set forth in the Contracts.  Because the Distribution Contracts impose separate duties from those imposed by the Franchise Act, Plaintiffs contend that § 1335.85(D) does not obviate the manufacturer's need to comply

with its contractual obligations.  Again, Defendants do not contend that Distributors have

committed any acts or breach that would permit termination on the specified grounds set forth in

the Distribution Contracts.

As a threshold matter, the Court notes that the system of contract law in Ohio "permits

each party to make a rational choice to breach his contract if economic efficiency so demands, so

long as he fully compensates the other contracting party." *Wagoner v. Leach Co*., No. 17580,

1999 WL 961166, at *20 (Ohio Ct. App. Jul. 2, 1999); *see also* 3 E. Allen Farnsworth, *Contracts*

§ 12.8 at 194–95 (2d ed. 1990) ("Most courts have not infringed on the freedom to keep or to

break a contract traditionally afforded a party by the common law and endorsed by efficient

breach.") (citations omitted); Oliver Wendell Holmes, "The Path of the Law" in *Collected Legal*

*Papers,* 167, 175 (1920) ("The duty to keep a contract at common law means a prediction that

you must pay damages if you do not keep it—and nothing else.")).  Generally speaking, then,

"[b]reach of contract is not illegal." *Mahoning Valley Sanitary Dist. ex. Rel. Betty D.*

*Montgomery v. The Gilbane Building Co*., No. 2:98-cv-785, 2001 WL 1871490, at *11 (S.D.

Ohio Oct. 17, 2001) (citing *Windsor Secs., Inc. v. Hartford Life Ins. Co.,* 986 F.2d 655, 664 (3rd

Cir. 1993)).

Thus, in the context of alcoholic beverage franchises, a manufacturer's termination of a

franchise agreement is not unlawful by operation of the contract, but because the Franchise Act –

with enumerated exceptions – prohibits manufacturers from "cancel[ing] or fail[ing] to renew a

franchise or substantially change a sales area or territory without the prior consent of the other

party for other than just cause and without at least sixty days' written notice." O.R.C. § 1333.85.

In enacting O.R.C. § 1333.85(D), the Ohio legislature created an exception to this general

prohibition for "successor manufacturers."  Ohio statute therefore no longer operates as a bar to

17

franchise termination for qualified successor manufacturers who comply with the terms of O.R.C. §§ 1333.85(D) and 1333.851.  A successor manufacturer acting pursuant to O.R.C. § 1333.85 can choose to terminate an existing contract – even irrespective of its terms – without running afoul of the law, "as long as it is willing to pay damages if its breach was wrongful" under the contract. *Mahoning Valley*, 2001 WL 1871490, at *11.

Whether termination by a successor manufacturer constitutes a breach of the Distribution Contracts is a separate question.  Defendants argue that, to the extent provisions of the Distribution Contracts preclude termination by a successor manufacturer, those provisions are invalid under the Franchise Act. Defendants rely on O.R.C. § 1333.83, which provides that "[a]ny provision of a franchise agreement that waives any of the prohibitions of, or fails to comply with, sections 1333.82 to 1333.87 of the Revised Code is void and unenforceable."

In *Bellas Co. v. Pabst Brewing Co*., 492 Fed. Appx. 553 (6th Cir. 2012), the Sixth Circuit considered whether a provision in a franchise agreement that imposed a sixty-day notice requirement for termination was void by virtue of a conflict with § 1333.85(D).  The *Pabst* Court explained that there was "no support for the breathtaking proposition that a state law invalidates non-conflicting private contract provisions relating to the subject matter addressed by the state law," and that, therefore, "as a rule, nothing prohibits parties from contracting for greater protections than those provided by statute." *Id*. at 557 (citing *Skinner v. Aetna Life and Cas.,* 804 F.2d 148 (D.C. Cir. 1986); *Clarendon Nat'l Ins. Co. v. Ins. Co. of the West,* 442 F.Supp.2d 914, 924 (E.D. Cal. 2006); *Golden Rule Ins. Co. v. Schwartz,* 786 N.E.2d 1010, 1015 (2003)). The franchise contracts at issue in that case granted the manufacturer "a right of unilateral termination if it gains such a right under state law—such as the termination right that the OABFA gives a successor manufacturer—but, even in the case of such a termination, …

18

require[d] [the manufacturer] to give [the distributor] 'at least sixty (60) days prior written notice.'" *Id.* On these facts, the Court concluded that the sixty-day notice requirement was valid because it did not conflict with the right of unilateral termination provided by § 1333.85, but simply provided additional protections for the distributor under that circumstance.  The Court therefore upheld the franchise provision as an enforceable contract term "for which the [Franchise Act] provides no excuse." *Id.*

Citing *Pabst*, Plaintiffs argue that the protections from termination included in the Distribution Contracts are valid and enforceable because they are "not inconsistent with the Act, but provide more generous terms to distributors than the minimum required by law." (Doc. 10 at 12-13).  As interpreted by the Distributors, however, the termination provisions of the Distribution Contracts would entirely preclude a successor manufacturer from terminating a distributor who has not breached the contract or engaged in certain specified acts that trigger the right of termination.  Thus, unlike the contract term upheld in *Pabst*, the provisions on which the Distributors rely directly conflict with a successor manufacturer's right under § 1333.85(D) unilaterally to terminate a franchise without just cause.  Thus, to the extent that any language in the Distribution Contracts entirely precludes application of § 1333.85(D), that language is "void and unenforceable." O.R.C. § 1333.83.

Moreover, the agreements themselves provide:

To the extent that the State, in which Wholesaler's territory is situated, has in effect specific provisions governing termination of the Supplier/Wholesaler relationship, which are contradictory to the termination provisions contained in Section 6, the State provisions shall prevail.

19

*See Tri County Contract* § 6.5; *Iron City Contract* § 6.5. Accordingly, by their very terms, the Distribution Contracts are subject to the successor manufacturer provisions enacted at subsection (D) of the Franchise Act.

In light of the above, Plaintiffs cannot rely on the termination provisions of the Distribution Contracts to nullify the rights of a qualified successor manufacturer under § 1333.85(D) to terminate a franchise without cause. This Court finds that Plaintiffs are not likely to succeed on the merits of their argument that the Distribution Contracts preclude a successor manufacturer from terminating pursuant to O.R.C. § 1333.85 absent a basis under the contract for such termination.

### 3. Application of § 1333.85(D) to Written Franchises

The Distributors also argue that O.R.C. § 1333.85(D) only applies to distributors who do not have a written contract following the successor manufacturer transaction. In Plaintiffs' view, § 1333.85(D) does not apply here because the written Distribution Contracts survived the KPS/CCR Transaction. The question of whether § 1333.85(D) applies to written contracts was accepted for discretionary review by the Ohio Supreme Court, Case No. 2012-0941, following conflicting decisions by the Stark County Court of Common Pleas and the Fifth District Court of Appeals. *See Esber Beverage Co. v. Labatt USA Operating Co., LLC*, No. 2009-CV-03142 (Stark Cnty. Common Pleas 2009) (holding §1333.85(D) did not apply to franchises established by written contract); *Esber Beverage Co. v. Labatt USA Operating Co., LLC,* 2012 Ohio 1183 (5th App. Dist. 2012) (holding that §1333.85(D) applied to written contracts). This matter was argued before the Ohio Supreme Court on May 8, 2013 and has not yet been decided.

Unless and until the Supreme Court overrules the decision of the Stark County Court of Appeals upholding the application of § 1333.85(D) to written contracts, the ruling of the

appellate court remains good law. Nevertheless, Plaintiffs' burden on a motion for preliminary injunction requires only that Plaintiffs raise issues so "significant" as to be "fair ground for litigation and thus for more deliberate investigation." *Ne. Ohio Coal.*, 696 F.3d at 591. Given the Ohio Supreme Court's discretionary acceptance of jurisdiction in *Esber v. Labatt*, this Court finds that there are significant issues here that are fair grounds for litigation. As such, the questions as to the merits of Distributors' argument against application of § 1333.85(D) to written franchise contracts weigh in favor of granting a preliminary injunction at this stage.

### 4. Whether O.R.C. § 1333.85(D) Constitutes an Unconstitutional Taking

Finally, the Distributors argue that, if § 1333.85(D) grants manufacturers a right to terminate unilaterally a franchise agreement without cause or a contractual basis, that would constitute government-compelled forfeiture of the Distributor's private property for the sole benefit of a private entity, the successor manufacturer. This, they contend, is an unconstitutional taking, in violation of the United States and Ohio Constitutions. Plaintiffs therefore argue that, at minimum, this Court should construe § 1333.85(D) to avoid such unconstitutional infirmity by interpreting the statute not to apply to distributors who, like Plaintiffs, have written franchise agreements.

The Fifth Amendment provides, in pertinent part, that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V; *see also Chi. Burlington & Quincy R.R. Co. v. Chicago*, 166 U.S. 226, 239 (1897) (holding that the Takings Clause applies to the states). A taking may assume one of two forms: *per se*, also known as a physical taking, or regulatory. *Waste Mgmt., Inc. of Tenn. v. Metro. Gov't of Nashville and Davidson Cnty.*, 130 F.3d 731, 737 (6th Cir. 1997). A physical taking occurs when "the government physically intrudes upon a plaintiff's property." *Id*. A regulatory taking occurs when a governmental

21

enactment leaves a property owner with "no productive or economically beneficial use" of his property, *Lucas v. S. Ca. Coastal Council*, 505 U.S. 1003, 1017 (1992), or prevents the property owner from enjoying "some — but not all — economic uses." *Harris v. City of St. Clairsville*, 330 F. Appx. 68, 76 (6th Cir. 2008). Thus, these constitutional guarantees are "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Penn. Cent. Transp. Co. v. New York*, 438 U.S. 104, 123 (1978) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)). Furthermore, "though the classic taking is a transfer of property to the State or to another private party by eminent domain, the Takings Clause applies to other state actions that achieve the same thing." *Stop the Beach Renourishment, Inc. v. Florida*, 130 S. Ct. 2592, 2600-01 (2010) (plurality opinion).

As the Ohio Supreme Court has explained, "it is axiomatic that the federal and Ohio constitutions forbid the state to take private property for the sole benefit of a private individual, even when just compensation for the taking is provided." *See City of Norwood v. Horney*, 110 Ohio St. 3d 353 (2006)) (internal citations omitted) (citing *Kelo v. New London*, 545 U.S. 469 (2005)).  The parties here agree that the termination rights conferred by § 1333.85(D) is not an award for public use.  Thus, if the operation of § 1333.85(D) can be properly characterized as a taking, it would not be constitutional.

Defendants advance two arguments as to why the operation of § 1333.85(D) does not constitute a taking.  First, they argue that there is no government action here.  Second, they argue that § 1333.85(D) does not actually seize or impair property rights.

### a. Presence of Government Action

In Defendants' view, O.R.C. § 1333.85(D) authorizes one private party to terminate its

22

contractual relationship with another private party under certain, enumerated circumstances. Plaintiffs acknowledge this, but argue that the private manufacturers are subject to constitutional constraints where their conduct is "fairly attributable to the state." *Romanski v. Detroit Entm't, LLC*, 428 F.3d 629, 636 (6th Cir. 2005).

Plaintiffs first argue that Defendants' actions are subject to the limitations of the Takings Clause because they are engaged in a traditional public function, namely, the taking of private property through eminent domain. *See id*. ("Under the public function test, a private entity is said to be performing a public function if it is exercising powers traditionally reserved to the state, such as…taking private property under the eminent domain power."); *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 353 (1974) (acknowledging that eminent domain is a traditional state activity). Plaintiffs' argument in this regard is circular: they argue that the termination of their franchises is a taking because this is government action, and that there is government action because this is a taking. A private party's termination of a private contract, however, is not equivalent to a taking by eminent domain. Indeed, private parties regularly terminate and breach contracts, thereby depriving the innocent party of the benefit promised. Thus, taken to its logical conclusion, Plaintiffs' argument would transform any breach of contract by a private party into a "public function" and, therefore, "government action."

Plaintiffs also argue that there is government action because the source of Defendants' claimed authority to terminate the Distribution Contracts is a state statute (i.e., O.R.C. § 1333.85(D)) and the mechanism for its enforcement is the court system. *See* O.R.C. §1333.851(B) (providing that, unless a distributor agrees to relinquish its rights, a manufacturer may only transfer distribution rights after a court order establishes the diminished value to be paid by the manufacturer or, if no such order is issued within ninety days, after a court order

23

authorizes transfer of the brands following payment of the manufacturer's last good faith offer).

This argument also fails. A private party's authority to terminate a contract has always been a

function of state law. Indeed, under the ordinary law of contracts in Ohio, "[b]reach of contract is

not illegal" and "a party may violate its contract at any time as long as it is willing to pay

damages if its breach was wrongful." *Mahoning Valley*, 2001 WL 1871490, at *11 (citing

*Windsor,* 986 F.2d at 664; *Van Cantfort v. Colmar Realty Co.,* 13 Ohio L. Abs. 499, 501 (Ohio

Ct. App. 1932)). *See also Wagoner*, 1999 WL 961166, at *20 ("[C]ontract law, by confining

damages to the each party's expectation interest, permits each party to make a rational choice to

breach his contract if economic efficiency so demands, so long as he fully compensates the other

contracting party.").  Moreover, in our system of contract law, judicial intervention is routinely

invoked to determine the amount of damages one party owes to another upon wrongful breach of

contract. Thus, again, taken to its logical extreme, Plaintiffs' argument would convert every

contract dispute that finds its way into court into a government action.  That cannot be the case.

Based on the above, this Court concludes that Plaintiffs are unlikely to succeed on the

merits of their argument that Defendants' termination of the Distribution Contracts pursuant to

O.R.C. § 13333.85(D) constitutes government action.

**b. Property Interest**

Defendants also argue that there is no taking because Plaintiffs do not have a property

interest in the contract rights at issue.  Section 1333.85(D), Defendants argue, does not "seize or

otherwise impair an identifiable fund of money," *McCarthy v. City of Cleveland*, 626 F.3d 280,

284-86 (6th Cir. 2010), but simply permits a private party to terminate a contract with another

private party.

As the Supreme Court has explained, "'[p]roperty interests … are created and their

24

dimensions are defined by existing rules or understandings that stem from an independent source such as state law[.]'" *Webb's Fabulous Pharmacies*, 449 U.S. at 161, (*quoting Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Constitutionally speaking, "a mere unilateral expectation or an abstract need is not a property interest entitled to protection." *Id.* Nevertheless, the Supreme Court has recognized that contracts may be property within the meaning of the Fifth Amendment. *See Omnia Commercial Co. v. U.S.*, 261 U.S. 502, 508 (1923) (citing *Long Island Water Supply Co. v. Brooklyn*, 166 U. S. 685, 690 (1897); *Cincinnati v. Louisville & Nashville Ry. Co.*, 223 U. S. 390, 400 (1912)).

As noted above, however, a private party's property interest in a contract is not equivalent to a right to specific performance of that contract. *See Mahoning Valley*, 2001 WL 1871490, at *11 ("A party may violate its contract at any time as long as it is willing to pay damages if its breach was wrongful.") (citing 3 Farnsworth, *Contracts* § 12.8 at 194–95; Holmes, "The Path of the Law" at 175). Thus, to the extent the Distributors have a property interest in their alcoholic beverage franchises above and beyond that afforded by ordinary contract law, it stems from state law, i.e., from the Franchise Act.

Because state law created and defined that enhanced property interest, the state legislature is likewise permitted to redefine its scope. Here, in authorizing a successor manufacturer to terminate a franchise upon payment of the "diminished value of the distributor's business that is directly related to the sale of the product or brand terminated or not renewed by the successor manufacturer," O.R.C. § 1333.85(D), the state legislature redefined a distributor's property interest in a franchise agreement and returned it to the common law norm. That redefinition of the property interest does not constitute a taking. Moreover, because subsection (D) ensures that a distributor is entitled to receive the "diminished value" of their business even

25

when a franchise is terminated, successor manufacturers who avail themselves of subsection (D) do not depriving distributors of their property interest in the terminated franchise.

Based on the above, the Court finds that Plaintiffs are unlikely to succeed on the merits of their argument that the application of O.R.C. § 1333.85(D) to written distribution contracts constitutes an unconstitutional taking under either the Ohio or United States Constitutions.[8]

### B. Irreparable Harm

The second factor of the preliminary injunction analysis considers whether the Distributors would suffer irreparable injury without the injunction. Such harm must be "likely," not just possible. *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008). As the Sixth Circuit has explained, "[a] plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Certified Restoration Dry Cleaning Network,* 511 F.3d at 550 (quoting *Overstreet v. Lexington–Fayette Urban Cnty. Gov't,* 305 F.3d 566, 578 (6th Cir. 2002)). Nevertheless, "an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make the damages difficult to calculate." *Id.* (quoting *Basicomputer Corp. v. Scott,* 973 F.2d 507, 511 (6th Cir. 1992)).

In *Tri-County v. The Wine Group*, the Sixth Circuit affirmed the district court's finding that a distributor would suffer irreparable harm upon the termination of its franchise based on a finding that:

> TWG's products comprise a significant portion of Plaintiffs' sales. Moreover, Plaintiffs have promoted and distributed TWG's beverages for decades. It is therefore reasonable to infer that Plaintiffs have acquired substantial good will in

---

[8] The Court recognizes that Plaintiffs have moved to certify to the Ohio Supreme Court the questions of 1) whether the application of O.R.C. § 1333.85(D) to written contracts would violate the Takings Clause of the Ohio Constitution; and 2) whether subsection (D) should be construed to avoid any such constitutional infirmity. (Doc. 23.)  When the Court considers that request, the Court will examine this matter more fully.  For the purposes of deciding Plaintiff's Motion for Preliminary Injunction, however, the Court need not ventilate this issue further.

> connection with their distribution of TWG's products, which include, in TWG's
> own words, "several unique, high velocity wines."

*The Wine Group*, 2012 WL 2478357, at *5 (quoting *Tri–Cnty. Wholesale Distribs., Inc. v. The

*Wine Grp., Inc.,* No. 2:10–cv–693, 2010 WL 3522973, at *8 (S.D. Ohio Sept. 2, 2010)). The

Sixth Circuit further explained that "[t]he loss of a product which is 'unique'… can cause a drop

in customer goodwill." *Id*. (citing *Ross–Simons of Warwick v. Baccarat, Inc.,* 102 F.3d 12, 19

(1st Cir. 1996); *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,* 60 F.3d 27, 37 (2d Cir. 1995)).

The Sixth Circuit also "recognized that a loss of business goodwill may constitute irreparable

harm because of the difficulty in calculating damages." *Id*. (quoting *Langley v. Prudential*

*Mortg. Capital Co., LLC,* 554 F.3d 647, 649 (6th Cir. 2009)).

Here, the Distributors have submitted affidavits averring that, if Defendants are permitted

to terminate their Distributor Contracts, Distributors will lose substantial sales and suffer other

irreparable harm. The Specified Brands account for approximately 41% of Tri County's beer

sales and 19% of Iron City's beer sales. *Biggin Aff*., Doc. 10, Ex. A, ¶8; *Chapman Aff*., Doc. 10,

Ex. B ¶8. Because the Specified Brands represent significant segments of the Distributors'

businesses, Plaintiffs assert that loss of those brands – even temporarily – will cause them to

suffer irreparable harm in the form of substantial loss of goodwill, reputational damage, and

losses with respect to efficiencies of scale. *Biggin Aff*. ¶10-20; *Chapman Aff*. ¶11-23. This, they

assert, will have a spillover effect on their sales of other products and their overall profitability,

causing them to lose other sales and potentially lose many of their existing customers altogether.

*Biggin Aff*. ¶10-20; *Chapman Aff*. ¶11-23. Plaintiffs further argue that the Specified Brands are

such significant, unique, and popular brands that, even if Distributors were able to secure other

labels to distribute (which, they assert, is highly unlikely in the present market), they would have

27

to compete against the very beers that they have helped promote. *Biggin Aff*. ¶18-20; *Chapman Aff*. ¶21-23.

In other cases involving beer distribution franchises purportedly terminated under the "successor manufacturer" provisions of §1333.85(D), this Court and others have found that comparable facts demonstrate sufficient irreparable injury to warrant the issuance of injunctive relief. *See St. Killian*, 2011 WL 3957255, at *4-5 (finding irreparable harm due to loss of customer goodwill and spillover loss of sales of other brands and granting preliminary injunction); *InBev USA LLC v. Hill Distrib. Co.*, Case No. 2:05-cv-298 (S.D. Ohio 2005) (finding irreparable harm and granting TRO "based on the prospective loss of revenue, goodwill and business reputation where the damages would be difficult, if not impossible, to calculate"); *R.L. Lipton Distrib. Co. v. InBev USA LLC*, Case No. 2:06-cv-1069 (S.D. Ohio 2006) (granting TRO in a distributor challenge to termination under §1333.85(D)); *Jameson Crosse, Inc. v. Kendall-Jackson Winery, Ltd.*, 917 F. Supp. 520 (N.D. Ohio 1996) (noting that, prior to removal to federal court, state court granted preliminary injunction maintaining the franchise relationship pending trial).

Defendants argue that injunctive relief is unnecessary here because the Franchise Act, O.R.C. §1333.851(A)(1), prohibits Defendants from withdrawing the Specified Brands prior to making the "diminished value" payment.[9] As a preliminary matter, diminished value payments

---

[9] O.R.C. § 1333.851(A) provides, in relevant part:

> With respect to any merger, acquisition, purchase, or assignment under division (D) of section 1333.85 of the Revised Code, both of the following apply:
>
> > (1) The territories for the particular product or brand of alcoholic beverage shall not be assigned to another distributor until the successor manufacturer compensates the terminated or nonrenewed distributor for the diminished value of the distributor's business.

28

do not compensate for the irreparable injury in loss of goodwill, reputational harm, and lost sale spillover described above. *See Wine Group*, 2010 WL 3522973, at *10 (finding irreparable harm because §1333.851 "is hardly a legislative determination that loss of good will is not difficult to calculate, let alone that a distributor should be compelled to accept an award of damages for loss of good will where the termination is unlawful"); *St. Killian,* 2011 WL 3957255, at *4-5 (finding irreparable harm because diminished value compensation only applies to lawful terminations by successor manufacturers).

Moreover, Defendants apparently intend to seek a Court order under § 1333.851(B)(5), allowing them to pay their last offer of diminished value to Distributors and to withdraw the brands ninety days after the filing of the Complaint in this case. It will be virtually impossible for the parties and the Court to litigate fully the merits of the Distributor's claims even within ninety days of this Opinion and Order. Thus, injunctive relief is appropriate to maintain the status quo in the interim. Indeed, relief preserving the status quo is particularly warranted here because the parties agree that a decision of the Supreme Court of Ohio in favor of the distributors in *Esber v. Labatt* would result in judgment for the Distributors in the matter *sub judice*.

In light of the above, this Court finds that that considerations of irreparable harm weigh in favor of issuing a preliminary injunction.

### C. Harm to Others

Plaintiffs argue that the requested injunctive relief will have no detrimental effect on Defendants. In support of this proposition, Plaintiffs explain that they have successfully sold the

---

(2) When a distributor receives written notice of termination or nonrenewal of its franchise pursuant to division (D) of section 1333.85 of the Revised Code, the distribution of beer or wine for ninety days or more without a written contract shall not constitute a franchise relationship between the successor manufacturer and the distributor under section 1333.83 of the Revised Code.

Specified Brands for many years, *Biggin Aff*. ¶5; *Chapman Aff*. ¶5, and that Defendants have

made no complaint about Distributors' promotion and distribution of the Specified Brands. *See*

*Termination Letters*. Thus, Plaintiffs argue that Defendants will not be prejudiced by being

required to continue to do business for a few more weeks in the manner in which they have been

conducting business for years.  Defendants' response in opposition to Plaintiff's motion for

preliminary injunction does not challenge Plaintiffs' conclusions in this regard.  The Court

therefore finds that this factor weighs in Plaintiffs' favor.

*D. Public Interest*

The final factor to consider is whether the public interest would be served by granting

injunctive relief. The Distributors argue that the public interest will be harmed if injunctive relief

is not granted because, if they lose the Specified Brands, they may have to lay off some portion

of their approximately 50-person staff.  These job losses, they argue, would be felt not only by

the employees and their families, but also by the communities in which they live. *Biggin Aff*.

¶21; *Chapman Aff*. ¶24. The Distributors also argue that disruption of their retailor relationships

and distribution channels would harm the public's ready access to the Specified Brands.

Defendants do not challenge either of these conclusions and the Court finds that they are entitled

to some weight.

Perhaps the most compelling public consideration here, however, is the public's interest

in the enforcement of the relevant provisions of the Ohio Revised Code.  As the Sixth Circuit has

explained, "there is no dispute that the statute the distributors seek to enforce is one that the Ohio

legislature passed through the ordinary democratic process. The Franchise Act therefore

represents the legislature's judgment that enforcement of the statute is in the public interest."

*The Wine Group*, 2012 WL 2478357, at *6 (citing *Golden Gate Rest. Ass'n v. City and Cnty. of*

30

*San Francisco,* 512 F.3d 1112, 1127 (9th Cir. 2008); 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 2948.4 (2d. ed. 2012) ("The public interest may be declared in the form of a statute.")). While there is a genuine dispute as to the application of O.R.C. § 1333.85(D), this Court and others have consistently recognized that the primary purpose of the Franchise Act is "to remedy the lack of equal bargaining power between Ohio's alcoholic beverage wholesalers and out-of-state alcoholic beverage manufacturers." *Pabst*, 492 Fed. Appx. at 558. *See also The Wine Group*, 2012 WL 2478357, at *6 (citing *Esber Bev. Co.,* 2012 WL 983194, at *4 (noting that the possibility of a manufacturer getting "locked into an unprofitable situation" has been determined by the Ohio legislature to be "a business risk which must be assumed by all manufacturers of alcoholic beverages which avail themselves of the rights and privileges of marketing their wares in Ohio") (citation and internal quotation marks omitted)); *Beverage Distribs.,* 803 F.Supp.2d at 777–78 ("The just cause requirement for terminating a franchise agreement is intended to protect the franchisee from this type of arbitrary and potentially coercive act.") (citation and internal quotation marks omitted). Thus, this Court finds that issuing an injunction in this case will serve the public interest by ensuring that Defendants' termination of Plaintiffs' franchises comports with Ohio law.

## V. CONCLUSION

Based on the foregoing, the Court finds that the balance of factors weighs in favor of issuing a preliminary injunction in this action. Plaintiff's Motion for Preliminary Injunction is, therefore, **GRANTED**. The Court hereby **ORDERS** as follows:

(1) Defendants and their affiliates are preliminarily enjoined from terminating Distributors as the distributors for the brands of beer specified in each of the Distributors' contracts with Labatt ("the Specified Brands") or otherwise purporting to allow for the appointment of new distributors for the Specified Brands in Distributors' respective territories, until resolution of this action.

(2) Defendants and their affiliates are preliminarily enjoined from taking any actions inconsistent with Distributors' franchises that would frustrate or otherwise prevent the delivery of the Specified Brands to Distributors, until resolution of this action.

**IT IS SO ORDERED.**

s/Algenon L. Marbley_____
**Algenon L. Marbley**
**United States District Court Judge**

**DATE: October 16, 2013**