**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **TRI COUNTY WHOLESALE** | **:** | |
| **DISTRIBUTORS, INC.,** *et al.***,** | **:** | |
| | **:** | |
| **Plaintiffs,** | **:** | |
| | **:** | **Case No. 2:13-CV-317** |
| **v.** | **:** | |
| | **:** | |
| **LABATT USA OPERATING CO., LLC,** | **:** | **JUDGE ALGENON L. MARBLEY** |
| *et al.***,** | **:** | |
| | **:** | **Magistrate Judge Deavers** |
| **Defendants.** | **:** | |

**OPINION & ORDER**

This matter is before the Court on Motion of Defendants Labatt USA Operating Co., LLC ("Labatt USA Operating"), Cerveceria Costa Rica, S.A. ("CCR"), and North American Breweries Holdings LLC ("NAB"), (collectively "Defendants") for Partial Summary Judgment on Counts One and Two of Plaintiffs' complaint (Count Three was previously dismissed, *see* Doc. 66), (Doc. 78), and cross-Motion of Plaintiffs Tri County Wholesale Distributors, Inc. ("Tri County") and the Bellas Company d/b/a Iron City Distributing ("Iron City") (collectively "Plaintiffs" or the "Distributors") for Summary Judgment. (Doc. 80.) For the reasons stated below, Defendants' Motion is **GRANTED** and Plaintiffs' Motion is **DENIED**.

**I. BACKGROUND**

*A. Factual Background*

This action arises out of the termination of beer and flavored malt beverage distribution contracts in alleged contravention of O.R.C. § 1333.82-7, Ohio Alcoholic Beverages Franchise Act ("Franchise Act" or "Act"). Plaintiffs Tri County and Iron City are Ohio distributors of alcoholic beverages. They possess franchise relationships with several manufacturers, including

Defendant Labatt USA Operating. As an entity that supplies alcoholic beverages to distributors in Ohio, Labatt USA Operating is a "manufacturer" of beer and flavored malt beverages, as that term is defined in O.R.C. § 1333.82(B). (Doc. 77 at ¶ 7).

### 1. Tri County and Iron City Distribution Contracts

Tri County and Iron City entered into written distribution agreements with Labatt USA Operating in 2010 and 2011, respectively. *See* Stipulation, (Doc. 77 at ¶¶ 8, 10); *see* P Ex. 1, Doc. 47-1, *Labatt USA Operating Co., LLC Distribution Agreement dated July 1, 2010* ("*Tri-County Contract*"); P Ex. 2, Doc. 47-2, *Labatt USA Operating Co., LLC Distribution Agreement dated June 28, 2011* ("*Iron City Contract*") (collectively, the "Distribution Contracts" or "Distribution Agreements"). The Distribution Contracts provide them with an exclusive and indefinite right to distribute certain brands of beer and alcohol (the "Specified Brands") in their respective territories. *See Tri-County Contract* §§ 1.0, 2.0; *Iron City Contract* §§ 1.0, 2.0. Each Distribution Contract limits the reasons for which Labatt USA Operating can terminate the Distributor. *See Tri County Contract* §§ 6.0-6.5; *Iron City Contract* §§ 6.0-6.5.

In 2012, the brands supplied by Labatt USA Operating constituted approximately 25% of Tri County's overall sales. (Doc. 77 at ¶ 9; P. Ex. 26). In 2012, the brands supplied by Labatt USA Operating made up approximately 8% of Iron City's overall sales. (Doc. 77 at ¶ 11; P. Ex. 27).

### 2. Divestment of the Labatt Brands and Labatt Corporate Structure

Prior to 2008, the Labatt family of brands was imported into the United States by InBev USA, LILAC. ("InBev USA"), which was a subsidiary of InBev NV./S.A. ("InBev"). (Doc. 77 at ¶ 33). In July 2008, InBev contracted to acquire Anheuser-Busch Companies, Inc. In November 2008, the U.S. Justice Department filed a civil antitrust complaint against InBev and

Anheuser-Busch in the U.S. District Court for the District of Columbia.[1] *Id.* at ¶ 34. InBev agreed to settle the case, and the district court entered a Final Judgment that required InBev to divest InBev USA and grant a perpetual license to the acquirer to brew and sell Labatt brand beer for consumption in the United States. *Id.* at ¶ 37; *Memorandum Order*, D. Ex. 2; *Response to Public Comments on the Proposed Final Judgment*, D. Ex. 5, Doc. 47-15.

In 2009, pursuant to the Final Judgment, the newly-formed Labatt USA Operating purchased specified assets of InBev USA. (Doc. 77 at ¶ 37; D. Ex. 17). In connection with the sale, Labatt USA Operating acquired the sub-license for all of the trademarks and beer recipes for the Labatt family of brands in the United States.[2] Labatt USA Operating does not own or operate brewing assets and does not brew any alcoholic beverages. (Doc. 77 at ¶ 26). Rather, pursuant to a contract between Labatt USA Operating and Molson Canada 2005 ("Molson"), Molson manufactures Labatt and Labatt Blue Light in Canada.[3] *Id.* at ¶¶ 25, 39. High Falls Operating manufactures all other Specified Brands, including the Labatt family of brands other than Labatt Blue and Labatt Blue Light, Genesee, Seagram's, Honey Lager, and the Dundee family of brands. *Id.* at ¶¶ 25.

Labatt USA Operating has a current Supplier Registration Certificate issued by the State of Ohio Division of Liquor Control. *Id.* at ¶ 27; P. Ex. 4. In addition, from time to time, Labatt

---

[1] The case was captioned *United States of America v. InBev N.V./S.A.*, Case No. 08-cv-1965.

[2] Specifically, in connection with the sale of InBev USA's assets to Labatt USA Operating, Labatt Brewing Company Limited transferred to a special purpose vehicle ("SPV"), Ontario, Inc., all of the trademarks and the beer recipes for the Labatt family of brands in the United States. In March 2009, Labatt Brewing Company Limited and Ontario, Inc. entered into a license agreement with Labatt USA Licensing Co., LLC. ("Labatt USA Licensing"). (Doc.77 at ¶ 37; P. Ex. 10). Subsequently, in November 2010, Labatt USA Licensing entered into a sub-license agreement, entitled *Amended and Restated Affiliate License Agreement (Labatt)*, with Labatt USA Operating. (Doc. 77 at ¶ 38; P. Ex. 11).

[3] In August 2010, Labatt USA Operating entered into an agreement with Molson Canada 2005 ("Molson"), a Canadian company, pursuant to which Molson would produce Labatt Blue and Labatt Blue Light products to be imported into the United States and supplied by Labatt USA Operating to distributors in Ohio and other states (the "*Molson Canada Supply Agreement*"). As a part of the *Molson Canada Supply Agreement*, Labatt USA Operating granted a sub-sub-license to Molson. Prior to the *Molson Canada Supply Agreement*, Labatt Canada had produced the Labatt Blue and Labatt Blue Light products for sale in the United States by Labatt USA Operating. Stip. ¶ 34.

USA Operating has filed with the State of Ohio Division of Liquor Control certain Territory Designation Forms relating to the brands supplied by Labatt USA Operating to distributors. (Doc. 77 at ¶ 18-20; P. Ex. 5).

Labatt USA Operating, as well as all sub-licensees of the Specified Brands except for Molson, are indirectly wholly owned by Defendant North American Breweries Holdings, LLC ("NAB Holdings").  (Doc. 77 at ¶ 20). Prior to December 11, 2012, all membership interests in NAB Holdings were owned by three entities: 1) KPS Special Situations Fund III, LP; 2) KPS Special Situations Fund III (A), LP; and 3) KPS Capital Partners[4] (collectively "KPS" or the "KPS entities"). *Id.* at ¶¶ 17, 20; *KPS Ownership Chart*, D. Ex. 1. KPS therefore controlled the rights to distribute the Specified Brands in the United States.

By a Unit Purchase Agreement dated October 25, 2012, Defendant Cerveceria Costa Rica, S.A. ("CCR"), through its affiliate CCR Breweries, Inc., contracted to buy 100% of the membership interests in NAB Holdings from the KPS entities (the "KPS/CCR Transaction"). (Doc. 77 at ¶ 23; P. Ex. 8).  The KPS/CCR Transaction closed on December 11, 2012.  On the closing date, KPS transferred all of its interests in NAB Holdings – including the accompanying distribution rights – to CCR or one of its affiliates.  (Doc. 77 at ¶¶ 18, 22; P. Exs. 8, 9).  As part of the KPS/CCR Transaction, CCR Breweries, Inc. was merged into NAB Holdings with NAB Holdings being the surviving entity, resulting in CCR American Breweries, Inc. owning 100% of NAB Holding's membership interests.  *Id.*; P. Ex. 9. From December 11, 2012 to the present, CCR American Breweries, Inc. has been owned 100% by CCR. (Doc. 77 at ¶ 24). According to Defendants Corporate Disclosure Statement, (Doc. 22), CCR is owned by Florida Ice and Farm Company S.A. (75%), a company that is publicly traded on the Costa Rican Stock Exchange, and

---

[4] KPS Capital Partners include Richard Lozyniak, James Pendegraft, Kenneth Yartz, Peter Bodenham, Jeff Cardell, Sandy Ford, and Mark Minunni.

Heineken NV (25%), whose parent is publicly traded on the Amsterdam Stock Exchange of NYSE Euronext.

Below the level of NAB Holdings, the various operating and licensing entities retained the same corporate structure they had prior to the KPS/CCR Transaction.[5] *Id.* at ¶ 20; *compare KPS Ownership Chart*, D. Ex. 1, *with CCR Ownership Chart*, P. Ex. 3. Following the KPS/CCR Transaction, the Distribution Contracts between Plaintiffs and Labatt USA Operating remained in place, the Distributors continued to order the Specified Brands from Labatt USA Operating, and the Specified Brands continued to be invoiced to the Distributors by Labatt USA Operating.

Ms. Katherine Markert, manager of wholesaler development and regulatory compliance for Labatt USA Operating, gave uncontroverted testimony that after the CCR/KPS Transaction, CCR is faced with ultimate business making decisions in Labatt USA Operating's operations, and has taken tangible steps to demonstrate such authority: CCR hired a third-party consulting group to evaluate the commercial side of the business and to create 3-5 year plans; CCR placed

---

[5] The parties stipulate that, prior to and after December 11, 2012, the following were and continue to be true:

    a. Defendant Labatt USA Operating has been owned 100% by Labatt USA Operating Holdings, LLC.

    b. High Falls Operating Company ("High Falls Operating") has been owned 100% by High Falls Operating Holdings, LLC.

    c. Labatt USA Operating Holdings, LLC and High Falls Operating Holdings, LLC have both been owned 100% by North American Breweries Operating Holdco, LLC.

    d. North American Breweries Operating Holdco, LLC has been owned 100% by NAB Holdco, LLC.

    e. North American Breweries Licensing Holdco, LLC has been owned 100% by NAB Holdco, LLC.

    f. NAB Holdco, LLC has also owned 1 share of the 1,000 outstanding shares (0.1%) of 1793161 Ontario, Inc. ("Ontario, Inc."), a Canadian entity. The other 999 shares of Ontario, Inc. (99.9%) are owned by Labatt Brewing Company Limited, a Canadian entity unaffiliated with Defendants.

    g. NAB Holdco, LLC has been owned 100% by North American Breweries, Inc.

    h. North American Breweries, Inc. has been owned 100% by North American Breweries Intermediate Holdings, LLC.

    i. North American Breweries Intermediate Holdings, LLC has been owned 100% by Defendant NAB Holdings.

    j. High Falls Licensing Co., LLC has been owned 100% by High Falls Licensing Holdings, LLC.

    k. Labatt USA Licensing Co., LLC has been owned 100% by Labatt USA Licensing Holdings, LLC.

    l. High Falls Licensing Holdings, LLC and Labatt USA Licensing Holdings, LLC are both 100% owned by North American Breweries Licensing Holdco, LLC.

(Doc. 77 at ¶ 20).

an individual in the organization from CCR whose position is integration manager, and whose job it is to help lead the integration of Labatt USA Operating into CCR's culture and business goals and expectations; Labatt USA's management reports to management of CCR; Labatt USA Operating could not have issued the termination letters to Distributors without CCR's knowledge and approval; and, CCR has the power to change Labatt USA management if it chooses, direct Labatt USA to do business with a particular distributor, and approve or disapprove of marketing campaigns. Transcript of May 28, 2013 Hearing, (Doc. 72 at 189-90, 194).

### 3. Purported Distribution Contract Terminations

On March 7, 2013 and March 11, 2013, Iron City received letters from CCR purporting to terminate the Distribution Contract between Iron City and Labatt USA Operating.  (Doc. 77 at ¶ 13; *see Iron City Termination Letter*, P. Ex 21.  On March 11, 2013, Tri County received a letter from CCR purporting to terminate the Distribution Contract between Tri County and Labatt USA Operating.  (Doc. 77 at ¶ 12; *see Tri County Termination Letter*, P. Ex. 22). The sole basis on which Defendants rely to terminate the Distributors' distribution rights is the successor manufacturer provision of Ohio Rev. Code §1333.85(D).  (Doc. 77 at ¶ 14).

Both termination letters stated: "[W]e hope, as a wholesaler with many years in the industry, you can appreciate that our decision was difficult, but necessary, in order for our company to remain competitive in the market." *Iron City Termination Letter* at 1; *Tri County Termination Letter* at 1. The termination letters do not reference any breach of the Distribution Contracts or violation of state law by the Distributors, or any of the specified grounds for termination referenced under Section 6.0 of the Distribution Contracts. *Id*.  The decision to terminate Iron City and Tri County as distributors was made upon the recommendation of Doug Tomlin, who at the time was the Regional Sales Director of Labatt USA Operating. James

Pendegraft, who at the time was the Vice President of Sales of Labatt USA Operating, agreed with the recommendation of Doug Tomlin, and Ramona Mendiola, Chief Executive Officer of CCR, ratified it and signed the termination letters. *(*Doc. 77 at ¶ 15). Neither of the Distributors has consented to termination of its franchise. *Id*. at ¶ 16.

If Defendants are permitted to terminate Distributors' rights to distribute the brands supplied by Labatt USA Operating in Distributors' respective territories, Labatt USA Operating will designate Superior Beverage Company as the distributor for the same brands currently distributed by Distributors for the same territories currently served by Distributors. *Id.* at ¶ 17.

### B. Procedural History

On April 4, 2013, Plaintiffs filed a complaint alleging breach of contract and additionally sought a declaratory judgment, asking the Court to find one of the following: (1) that Defendants are prohibited from terminating their existing distribution franchises with Labatt pursuant to O.R.C. § 1333.85(D); (2) or that O.R.C. § 1333.85(D) so-applied would constitute an unconstitutional taking. (Doc. 1). On April 11, 2014, Plaintiffs moved for preliminary injunction seeking to enjoin Defendants from terminating their contracts and from taking any actions that would frustrate or prevent delivery of the brands at issue. (Doc. 9). Following a preliminary injunction hearing, the Court granted Plaintiffs' preliminary injunction on October 16, 2013, but only on one basis. (Doc. 56). The Court found fair ground in litigation on Distributors' argument against application of § 1333.85(D) to written franchises contracts, because that issue had been accepted for discretionary review by the Ohio Supreme Court, and the decision was pending. *See Esber Beverage Co. v. Labatt USA Operating Co.*, 2013-Ohio-4544, 138 Ohio St. 3d 71 *reconsideration denied,* 2014-Ohio-566, 138 Ohio St. 3d 1418.

The Court also held, however, that Plaintiffs were unlikely to succeed on the merits on the following proposed findings of law: (1) CCR is not a "successor manufacturer" for the purposes of O.R.C. § 1333.85(D); (2) Distribution Contracts preclude a successor manufacturer from terminating pursuant to O.R.C. § 1333.85(D) absent a basis under the contracts for such termination; and, (3) Defendants' termination of the contracts pursuant to O.R.C. §1333.85(D) constitutes an unconstitutional taking.

On October 17, 2013, however, the Ohio Supreme Court issued its opinion in *Esber*, holding that O.R.C. §1333.85 (D) permitted a "successor manufacturer" to terminate a written franchise agreement, without cause, assumed in its purchase of another manufacturer, brand, or product. *Id.* Subsequently, Defendants moved this Court to vacate its preliminary injunction order pursuant to the holding in *Esber*. This Court found in Defendants' favor on August 14, 2014. (Doc. 73).

Defendant moved for Partial Summary Judgment on September 15, 2014. (Doc. 78). Plaintiff also moved for Summary Judgment on September 15, 2014. (Doc. 80). These cross-motions have been fully briefed and argued, and are ripe for review.

## II. STANDARD OF REVIEW

Summary judgment is proper if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed.  R. Civ.  P. 56(c).  A fact is material if proof of that fact would establish one of the elements of a claim and would affect the application of governing law to the rights of the parties.  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citing *Johnson v. Soulis, Wyo.*, 542 P.2d 867, 872 (1975)). "All evidence and reasonable inferences 'must be viewed in the light most favorable to the party opposing the motion.'" *Pucci*, 628 F.3d at 759 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

8

(1986)). Defendants' burden is satisfied if there is an absence of evidence to support Plaintiff's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Street v. J.C. Bradford & Co.*, 886 F.3d 1472, 1477-78 (6th Cir. 1989).

## III. LAW AND ANALYSIS

Plaintiffs assert that Defendants cannot avail themselves of § 1333.85(D)—which permits a "successor manufacturer" to terminate a franchise, other than for just cause, under certain circumstances—because CCR, as an entity, is not a "successor manufacturer," and thus the KPS/CCR Transaction did not trigger the §1333.85(D) exception. Additionally, Plaintiffs argue that Defendants did not comply with the statutory notice requirements of §13338.85(D) because CCR was not a "successor manufacturer," and thus was the improper entity to send the notice of termination. As such, Plaintiffs argue that they are entitled to summary judgment as a matter of law because CCR was not entitled to avail itself of §1333.85(D); thus, termination of the Distribution Contracts pursuant to §1333.85(D) is not permissible under the Act.

Defendants contend that under the law-of-the-case doctrine, Plaintiffs' claims should be rejected. Alternatively, Defendants argue that even if the Court determines that the law-of-the-case-doctrine does not apply, the Court should find that the § 1333.85 (D) exception to the "just cause" requirement of the Franchise Act applies to CCR because it acquired the supplier, Labatt USA Operating, and asserts control over its business decisions.

### A. The Law-of-the-Case Doctrine

As a threshold matter, this Court will address the Defendants' law-of-the-case argument.

Defendants argue that the law-of-the-case doctrine applies here. The doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. This rule of practice promotes the finality and efficiency

of the judicial process by protecting against the agitation of settled issues." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-816 (1988) (internal quotations and citations omitted). Specifically, Defendants note that the Court has twice analyzed the merits of Plaintiffs' claims, and has found that Plaintiffs have no likelihood of success on the merits. In addition, the facts before the Court in this motion are identical to those that were before the Court in Plaintiffs' Preliminary Injunction Motion and the Defendants' Motion to Vacate the Preliminary Injunction. (Docs. 56, 73). As such, Defendants argue that they are entitled to summary judgment on all substantive counts remaining, and the Parties should proceed to a hearing on the only remaining count—Count Four, a determination of the diminished value of Defendants' business pursuant to § 1333.851 of the Franchise Act.

As Plaintiffs properly note, however, the law-of-the-case doctrine does not generally apply to preliminary injunction decisions:

> Because of the lesser burden of proof required to support a motion for preliminary injunction as contrasted with a motion for summary judgment, a trial court's disposition of the substantive issues joined on a motion for extraordinary relief is not dispositive of those substantive issues on the merits. As a general rule, decisions on preliminary injunctions do not constitute law of the case and parties are free to litigate the merits.

*William G. Wilcox, D.O., P.C. Employees' Defined Ben. Pension Trust v. United States*, 888 F.2d 1111, 1114 (6th Cir. 1989) (internal quotations omitted); *See also Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("[I]t is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits.").

As the Supreme Court and Sixth Circuit explain, this Court is not bound by its findings in the Preliminary Injunction Orders. (Doc. 56, 73). Nonetheless, this Court previously determined that Plaintiffs were unlikely to succeed on the merits of their argument that CCR is not a "successor manufacturer," and neither party presents any new facts in this matter. This Court

acknowledges, however, that the parties presented additional precedent and legislative history in their Summary Judgment briefings regarding interpretations of § 1333.85 (D), the "successor manufacturer" exception to just cause termination. Further, the Ohio Supreme Court's recent binding decision in *Esber Distributing Co. v. Labatt USA Operating Co.* has direct application to the case *sub judice*, and merits further analysis. For these reasons, the Court will readdress Plaintiffs' argument that CCR is not a "successor manufacturer."

### B.  Whether CCR is a "Successor Manufacturer"

The Ohio Alcoholic Beverages Franchise Act ("Franchise Act" or "Act") governs the franchise relationships between manufacturers and distributors of alcoholic beverages, including beer, within Ohio. O.R.C. § 1333.82-7.  The Act mandates that "[E]very manufacturer of alcoholic beverages shall contract with or offer in good faith to its distributors a written franchise providing for, and specifying the rights and duties of both parties in effecting, the sale of the specified brands or products of the manufacturer." O.R.C. § 1333.83. When a distributor "or the successors or assigns of the manufacturer, distributes the beer or wine for ninety days or more without a written contract, a franchise relationship is established between the parties," and the Act applies to that new franchise relationship. *Id.* Thus, "an alcoholic-beverage-distribution franchise is a creature of statute," forced upon manufacturers by operation of law. *Esber* 2013-Ohio-4544, ¶ 10, 138 Ohio St. 3d 71, 73 (2013). While manufacturers can choose to specify terms of their franchise agreements with distributors by memorializing them in writing, the agreements are forced upon them as a matter of law regardless.

What is more, under § 1333.85 of the Act, unless an entity is a "successor manufacturer," a franchise agreement that arises out of operation of law, written or not, cannot be terminated absent prior consent, unless just cause exists and notice is provided. R.C. § 1333.85. Subsection (A) of § 1333.85 lists three situations that always constitute just cause: (1) voluntary bankruptcy;

(2) involuntary bankruptcy; or (3) loss of liquor permits. Subsection (B) of § 1333.85 lists four situations that never constitute just cause: (1) failure of a party to take action that would result in a violation of federal or state law; (2) restructuring, other than in bankruptcy, of a manufacturer's business; (3) unilateral alteration of the franchise by a manufacturer for a reason unrelated to any breach of the franchise or violation of R.C. §§ 1333.82 and 1333.86; and (4) "a manufacturer's sale, assignment, or other transfer of the manufacturer's product or brand to another manufacturer over which it exercises control." Subsection (C) of § 1333.85 governs how a manufacturer and distributor should deal with excess inventory in case of termination.

Section 1333.85(D) is the section at issue in this case, as it permits a "successor manufacturer" to terminate a franchise, other than for just cause, under certain circumstances. Section 1333.85(D) states in full:

> "If a successor manufacturer acquires all or substantially all of the stock or assets of another manufacturer through merger or acquisition or acquires or is the assignee of a particular product or brand of alcoholic beverage from another manufacturer, the successor manufacturer, within ninety days of the date of the merger, acquisition, purchase, or assignment, may give written notice of termination, nonrenewal, or renewal of the franchise to a distributor of the acquired product or brand. Any notice of termination or nonrenewal of the franchise to a distributor of the acquired product or brand shall be received at the distributor's principal place of business within the ninety-day period. If notice is not received within this ninety-day period, a franchise relationship is established between the parties. If the successor manufacturer complies with the provisions of this division, just cause or consent of the distributor shall not be required for the termination or nonrenewal. Upon termination or nonrenewal of a franchise pursuant to this division, the distributor shall sell and the successor manufacturer shall repurchase the distributor's inventory of the terminated or nonrenewed product or brand as set forth in division (C) of this section, and the successor manufacturer also shall compensate the distributor for the diminished value of the distributor's business that is directly related to the sale of the product or brand terminated or not renewed by the successor manufacturer. The value of the distributor's business that is directly related to the sale of the terminated or nonrenewed product or brand shall include, but shall not be limited to, the appraised market value of those assets of the distributor principally devoted to the sale of the terminated or nonrenewed product or brand and the goodwill associated with that product or brand."

12

Although O.R.C. § 1333.82(B) defines the term "manufacturer," as "a person, whether located in this state or elsewhere, that manufactures or supplies alcoholic beverages to distributors in this state," the Act does not define separately the term "successor manufacturer," used in the § 1333.85(D). And, total reliance on the definition of "manufacturer" to define "successor manufacturer" is "misplaced." *Hill Distrib. Co. v. St. Killian Importing Co.*, No. 2:11-cv-709, 2011 WL 3957255, *2 (S.D. Ohio Sept. 7, 2011). Thus, courts have been tasked with determining what the legislature meant when it used this term. *InBev USA LLC v. Hill Distributing Co.*, No. 2:05–cv–00298, 2006 WL 6924045, at *5 (April 3, 2006 S.D. Ohio).

The majority of past cases analyzing contested applications of the "successor manufacturer" exception concern whether the underlying acquisition of a manufacturer, product, or brand fell within the circumstances that never constitute "just cause" for termination under § 1333.85(B)(2) and (4) — corporate reorganizations or shifting of brands among entities under common control. *See, e.g.*, *Hill Distrib. Co. v. St. Killian Importing Co.*, No. 2:11-cv-709, 2011 WL 3957255, *2 (S.D. Ohio Sept. 7, 2011); *InBev USA LLC v. Hill Distributing Co.*, No. 2:05–cv–00298, 2006 WL 6924045, at *5 (April 3, 2006 S.D. Ohio). In such cases, courts are tasked with determining whether an alleged "successor manufacturer" may be trying to evade the strictures of the Franchise Act and terminate franchises merely due to corporate reorganizations or shifting of brands among entities under common control. The legislative history indicates that such shifting and reorganizations are prohibited. *Beverage Distributors, Inc. v. Miller Brewing Co.*, 803 F. Supp. 2d 765, 772 (S.D. Ohio 2011) *aff'd,* 690 F.3d 788 (6th Cir. 2012)

In the prior Preliminary Injunction Orders in this case, the Court determined that the KPS/CCR Transaction fell squarely within the bounds of §1333.85(D), and did not fall within any of the prohibited conduct in §1333.85(B)(2), or (B)(4). The KPS/CCR Transaction was an

13

"arms-length" transaction, in which KPS retained no interest in the Specified Brands, and CCR acquired 100% of the membership interest in NAB Holdings from KPS entities, including Labatt U.S.A Operating.  This Court also determined that through its affiliate CCR Brewing, Inc., CCR had in fact "acquire[d] all …. of the stock or assets" of NAB Holdings "through merger or acquisition." This Court held, therefore, that under an analysis of the KPS/CCR transaction, CCR appeared to qualify as a "successor manufacturer" under § 1333.85(D) and Plaintiffs were unlikely to succeed on the merits of its argument that CCR was not a "successor manufacturer."

Plaintiffs argue, however, that this uncontested analysis of the KPS/CCR Transaction aside, the Court must not focus exclusively on whether the underlying transaction was permissible for §1333.85(D) to be triggered under a plain reading of §1333.85 (B)(2) and (4), and § 1333.85(D).  Instead, Plaintiffs insist the Court must determine as a threshold matter whether CCR is the type of entity that qualifies as a "successor manufacturer" such that it has a right to avail itself of the § 1333.85(D) exception to "just cause" termination. Plaintiffs argue, specifically, that §1333.85(D) does not apply to the CCR/KPS Transaction because CCR is neither a "successor" nor a "manufacturer" under a plain reading of the Act.

Plaintiffs argue that CCR is not a "successor" because under the KPS/CCR Transaction—a remote, parent-holding company stock transaction—the licensed manufacturer has not changed. Plaintiff's primary evidence for the assertion that CCR cannot be a "successor" under these circumstances is the fact that the written franchise agreements remain in place after the KPS/CCR transaction, as well as the fact that the corporate structure of Labatt USA Operating remains unchanged.  As CCR is not a "successor," Plaintiffs contend, neither can it be a "successor manufacturer."

Further, Plaintiffs assert that CCR is not a "manufacturer" within the meaning of "successor manufacturer" because it does not adhere to the definition of "manufacturer" under O.R.C. § 1333.82(B), which defines "manufacturer" as "a person, whether located in this state or elsewhere, that manufactures or supplies alcoholic beverages to distributors in this state." Plaintiffs point out that CCR does not manufacture or supply any alcoholic beverages, it is not registered to "manufacturer" or "supply" alcoholic beverages, as required of any supplier or manufacturer under Ohio law and it is not the entity that will contract with new Ohio distributors following the KPS/CCR Transaction. Thus, Plaintiffs argue, CCR is not a "manufacturer" and cannot be a "successor manufacturer" entitled to termination without just cause under §1333.85(D) of the Act. Plaintiffs also argue that same entity which effectuates the qualifying transaction under § 1333.85(D)—acquiring all assets and stocks of a preceding manufacturer— also should be the entity to perform the steps outlined in §1333.85(D) toward a valid termination. In this case, Defendants have stated that Labatt USA Operating, not CCR, will perform steps toward valid termination.

Defendants argue that CCR is a "successor manufacturer" under the Act because under a plain reading of §1333.85(D), and consistent with this Court's prior holdings, it acquired "all of the stock" in Labatt USA Operating, and, thus, was permitted to terminate the Distributor Contracts within ninety days of the KPS/CCR Transaction provided it paid all necessary compensation to Distributors.

1. *Defining "successor"*

a. *Termination of the existing, written Distribution Contracts*

The Court will first address Plaintiff's argument that CCR cannot be a "successor" within the meaning of "successor manufacturer" because the franchise agreements remain in place between Labatt USA Operating and Distributors after the KPS/CCR Transaction.

The Ohio Supreme Court's decision in *Esber Beverage Co. v. Labatt USA Operating* supports this Court's reading that §1333.85(D) allows the "successor manufacturer" to terminate written contracts that it assumes in the acquisition of assets or stock of a manufacturer, brand, or product, as occurred in this case. Thus, *Esber* undermines Plaintiffs' argument that CCR is not a "successor" because Labatt USA Operating still has written franchises with Distributors after the CCR/KPS Transaction.

In *Esber*, InBev N.V./S.A. sold the Labatt brands to KPS Capital Partners, L.P., ("KPS") a private equity firm. 2013-Ohio-4544 at ¶ 4. In that transaction, KPS assumed the written distribution agreement between InBev and its distributors. *Id.* at ¶ 6. KPS owned North American Breweries Holdings, LLC, which in turn owned 100% of North American Breweries, Inc. (NAB). *Esber Beverage Co. v. Labatt USA Operating Co.,* 2012-Ohio-1183, ¶ 2 *appeal allowed,* 2012-Ohio-4381, ¶ 2, and *aff'd,* 2013-Ohio-4544, *reconsideration denied,* 2014-Ohio-566. After KPS purchased the Labatt brands, knows as Labatt USA, it formed Labatt USA Operating Company, L.L.C. as an indirect, wholly owned subsidiary of NAB, for the sole purpose of acquiring InBev's assets related to Labatt brands. *Id.* Shortly after acquiring the Labatt brands, Labatt USA Operating registered with Ohio as a supplier, and NAB terminated Labatt's distributor, Esber. The distributors argued that §1333.85(D) did not apply because Labatt USA Operating, via KPS, assumed the written distribution agreements in the transaction,

16

and §1333.85(D) only applied when the franchise agreement at issue arose statutorily and was never memorialized in writing. The Ohio Supreme Court held:

> The plain language of the statute allows the successor manufacturer to terminate a franchise. The definition of "franchise" includes both written franchise agreements and franchise agreements that have arisen by operation of law. R.C. 1333.82(D). Allowing a successor manufacturer to terminate a written franchise agreement without cause is clearly permitted under R.C. 1333.85(D), as long as the successor manufacturer provides written notice of the termination to the distributor within 90 days of the sale, merger, or acquisition, and as long as compensation for the lost value of the franchise is provided. Moreover, pursuant to statute, the parties are unable to restrict this right of termination by contract— under R.C. 1333.83, any provision of a franchise agreement that waives any of the prohibitions of, or fails to comply with, sections 1333.82 to 1333.87 of the Revised Code is void and unenforceable.

*Esber* 138 Ohio St. 3d at 74-75 (2013); *see also Esber* 2012-Ohio-1183, ¶¶ 33-35 ("The statute clearly gives a successor manufacturer a narrow window of time in which to determine whether it wants to keep the franchise agreements with distributors it assumed from its predecessor, or whether it wants to terminate such agreements with distributors.").

Thus, a plain reading of the Franchise Act shows that upon a complete acquisition of a manufacturer, brand, or product, the new owner has a "window of time" in which to terminate franchise agreements, written or not, that the distributors had with the prior manufacturer or supplier. This "window" comports with the overall scheme of the Act, considering that under the Act, "an alcoholic-beverage-distribution franchise is a creature of statute," forced upon manufacturers by operation of law. *Esber* 138 Ohio St.3d at 73 (2013). Whether an alcoholic beverage distribution franchise in Ohio exists in writing or arises purely as a matter of law is irrelevant, as the "manufacturer" is forced into an unbreakable franchise agreement either way. It follows, that by operation of law, the "successor manufacturer" would be able to terminate a statutorily-imposed franchise agreement, over which is had no prior control. Therefore, as *Esber* shows, the mere continuation of the written Distributors Agreements after the KPS/CCR

17

transaction does not disqualify CCR as a "successor manufacturer," as the Act presupposes that such agreements can be terminated by operation of law after a qualifying transaction.

The *Esber* Court's ruling undermines Plaintiffs' argument that *Bellas Co. v. Pabst Brewing Co.,* 492 Fed. Appx. 553 (6th Cir. 2012) shows that a change in a manufacturer's parent company does not trigger § 1333.85(D) because such a change has no legal impact on the validity of written franchise agreements assumed in the transaction. In *Bellas*, Pabst Holdings, Inc. (PHI) acquired all the stock of Pabst Brewing Company ("PBC") from S & P Company pursuant to a Stock Purchase Agreement. *Id.* at 555. Pabst Holdings, Inc. had no assets other than the stock of Pabst Brewing Company. *Id.* PBC was a "manufacturer" as that term is defined by § 1333.82(B). *Id.* After the Stock Purchase Agreement, PBC terminated its franchise agreements pursuant to § 1333.85(D), arguing that its new owner, PHI, was a "successor manufacturer." *Id*. The Court assumed *arguendo* that PHI was a successor manufacturer. *Id.*; *see also Bellas Co. v. Pabst Brewing Co.*, No. 2:10-CV-907, 2011 WL 883154, at *4 (S.D. Ohio Mar. 11, 2011) *aff'd,* 492 F. App'x 553 (6th Cir. 2012).

 The Plaintiffs/distributors in that case argued that termination was barred because PBC failed to notify distributors within sixty days of termination as required by the existing distributor agreements. *Id.* at 557. Defendants argued that PBC, when owned by PHI, never had distributor agreements with distributors, and since §1333.85(D) gave successor manufacturers a right of automatic termination, the Franchise Act superseded the sixty-days notice provision in the prior agreements. *Id.* The *Bellas* Court dismissed Defendants' argument, stating that the agreements were between PBC and distributors, and were binding after the PHI-S&P Company transaction and until the "successor manufacturer" affirmatively terminated them:

> "Pabst had existed continuously since 1924, and there was no change in Pabst's name or corporate form resulting from the stock purchase…. Furthermore, Pabst

cites no legal authority for the proposition that Pabst's preexisting distributor agreements automatically ceased to be binding when PHI purchased all of Pabst's stock. No such authority exists. Otherwise, chaos would ensue any time a company purchased all of the stock of another corporation. In short, there is no provision of law or any agreement that provides for automatic termination of Pabst's preexisting distributor agreements with Plaintiffs immediately upon PHI's purchase of all of Pabst's stock."

*Id*.

Plaintiffs cite this authority for the proposition that an entity cannot qualify as a "successor manufacturer" where prior written distribution agreements remain in place after a qualifying transaction under §1333.85(D). Plaintiff misreads this authority, however. The *Bellas* Court holds only that written franchise agreements are not automatically terminated when a "successor manufacturer" executes a qualifying transaction. Instead, the terms of a preexisting distribution agreement continues to be binding upon the "successor manufacturer" until the "successor manufacturer" affirmatively gives notice of termination within 90 days, or within such shorter period as set forth in the distribution agreement. As stated above, *Esber* states unequivocally that §1333.85(D) allows for the termination of preexisting, written franchise agreements that carry over when a new entity purchases a manufacturer, brand or product, as long as the termination takes place within 90 days.

The legislative history surrounding the passage of §1333.85(D) supports the holding in *Esber* that §1333.85(D) is an exception to just cause that permits the termination of otherwise intact written franchise contracts that a "successor manufacturer" assumes in the acquisition of a "manufacturer," product or brand. *See, e.g., Cleveland Mobile Radio Sales, Inc. v. Verizon Wireless,* 2007-Ohio-2203 (holding that to resolve statutory ambiguity, the Court can "look to the language of the statute, the circumstances under which the statute was enacted, legislative history, and the consequences of a particular construction when determining the intention of the

legislature."). The original 1974 version of the Act did not include § 1333.85(D); it only included the introductory paragraph in §1333.85, prohibiting termination of a franchise without just cause, and the list of exceptions to just cause, which is now §1333.85(A). In 1990, the Legislature added §1333.85(B), which included the detailed list of situations that do not constitute just cause, which is unchanged today. 1990 Ohio Laws File 239. Then, in 1992, the legislature added §1333.85(D).

Both parties agree that §1333.85(D) was added in response to a series of trial-level cases that culminated in *Tri-County Distributing, Inc. v. Canandaigua Wine Company, Inc.,* 68 Ohio St. 3d 123 (1993)*,* which concerned a 1991 transaction in which Canandaigua Wine Company, Inc., purchased the assets of Guild Wineries and Distilleries ("Guild"). *Id.* at 124; *see also Tri-Cnty. Distrib., Inc. v. Canandaigua Wine Co.*, No. 92 C.A. 37, (Ohio Ct. App. June 11, 1992) *rev'd sub nom. Tri Cnty. Distrib., Inc. v. Canandaigua Wine Co.*, , 68 Ohio St. 3d 123; *Esber Beverage Co. v. Canandaigua Wine Co.,* No. CA-8974, 1992 WL 362482, at *1 (Ohio Ct. App. Nov. 23, 1992) *aff'd sub nom. Esber Beverage Co. v. Canandaigua Wine Co.,* 68 Ohio St. 3d 463; *Tramonte Distrib. Co. v. Canandaigua Wine Co.*, No. 15620, 1993 WL 12164 (Ohio Ct. App. Jan. 20, 1993) *rev'd sub nom. Tramonte Distrib. Co. v. Canandaigua Wine Co.*, 68 Ohio St. 3d 515. The purchase agreement stated that as a condition to the closing, Canandaigua agreed to notify, prior to closing, the Distributors that they would not be appointed as distributors and their Distribution agreements would not be assumed by Canandaigua. *Id.* Immediately after purchasing Guild, Canandaigua sent a letter and contract to the three former distributors for Guild inviting them to enter into an order-by-order relationship. *Id.* Before six months had passed (the amount of time under the prior version of the Act before which a franchise agreement was statutorily imposed), Canandaigua notified all three that it had decided not to make them its

distributors. *Id.* at 126. Each distributor brought suit alleging wrongful termination under the Franchise Act, claiming that the order-by-order contracts were sufficient to give rise to a franchise agreement.  The Ohio Supreme Court ultimately determined that the mere existence of a contract which disclaimed any intention to create a relationship, with a term was for less than six months did not create a franchise relationship. *Id.* at 129. Thus, the distributors were left with nothing—neither a continuation of the franchise agreement with Guild, nor compensation for its termination. The Supreme Court of Ohio noted in a footnote, however, that "[w]hile inapplicable to the instant controversy, subsequent amendments to R.C. 1333.85 [referencing Am.Sub.H.B. No. 75, which added §1333.85(D)], appear to address the situation presented herein." *Id.*

Both parties agree that *Canandaigua* shows that prior to the passage of §1333.85(D) the Franchise Act did not bind a new owner of a manufacturer, product or brand to the franchise agreement between the prior owner and its distributors when the new owner did not assume the prior distribution agreements during the purchasing transaction. Both parties also agree the *Canandaigua* Court's reference to the passage of §1333.85(D) through H.B. 725 indicates that the Court believed that the Legislature passed §1333.85(D) in response to the fact pattern in *Canandaigua*, or at least that §1333.85(D) would remedy the circumstance where the purchase of a manufacturer, product, or brand left distributors without the protections of the Act and, especially, without any compensation for the loss of a franchise after such a transaction.

The relevant question *Canandaigua* raises is whether §1333.85(D) was passed as an additional protection, purely to compensate distributors such as those in Canandaigua, when a manufacturer, brand or product is sold to a new manufacturer and the new owner did not assume the old contracts, or whether § 1333.85(D) was intended to be an exception that allows any new

manufacturer to terminate the old franchise agreement, as long as distributors receive compensation and the proper procedure is followed.

Plaintiffs and Defendants' arguments concerning the significance of *Canandaigua* to the legislative history evolved throughout their briefing. In earlier briefing, Plaintiffs argued that the "successor manufacturer" must be a "manufacturer" within the meaning of the Act because the §1333.85(D) was a narrow exception to the Act that allowed a manufacturer with existing distribution networks, who acquired a brand, to consolidate distribution networks. Plaintiffs offered no citation for this proposition. Defendants responded that *Canandaigua* shows that §1333.85(D) was not passed as an exception allowing licensed "successor manufacturers," within a strict reading of the Act, to consolidate their existing distribution networks with the acquired brand, but instead as a financial protection for distributors losing brands without compensation. In response, Plaintiffs changed their position and agreed that *Canandaigua* indeed showed §1333.85(D) was added as a compensation provision only, not an exception for the consolidation of distribution networks, but that *Canandaigua* ultimately also showed that §1333.85(D) was passed only to resolve situations like in *Canandaigua*, where prior distribution agreements do not carry over in the transaction, and the "successor manufacturer" and distributors have no existing franchise relationship. Thus, Plaintiffs argue that the reasoning used in *Canandaigua* cannot be applied to the KPS/CCR transaction because Labatt USA Operating— the entity with whom Distributors have a franchise agreement—has not changed; and, as a contract still exists between Labatt USA Operating and Distributors, CCR is not a "successor manufacturer" and §1333.85(D) is not triggered.

Both parties misread the legislative history. In 1992, the same year as the Guild/Canandaigua transaction and after the lower court's ruling in those cases, the Legislature

removed the phrase "over which it exercised control" from the end of § 1333.85(B)(4). 1992 Ohio Laws File 235 (H.B. 693), eff. Nov. 6, 1992. In other words, "A manufacturer's sale, assignment, or other transfer of the manufacturer's product or brand to another manufacturer," as occurred in *Canandaigua*, did not constitute just cause for termination or nonrenewal of a franchise any longer. It is likely that this was the Legislature's first response to *Canandaigua*, as a plain reading shows H.B. 693 prevented any sale of a manufacturer, product, or brand to result in termination of the Distributor, regardless of whether a contract carried over in the transaction. Then, only six months later, the Legislature passed 1992 Ohio Laws File 296 (H.B. 725), eff. Apr. 16, 1993, referenced in the Court's ruling in *Canandaigua*. H.B. 725 reinstated the phrase "over which it exercises control" to the end of §1333.85(B)(4)—thus preventing any terminations without just cause due to mere restructuring only, and not under *any* circumstances—and also inserted §1333.85(D) for the first time.

This rapid modification shows that while H.B. 693 may have been passed as a failsafe protection for distributors, H.B. 725 appears to have been passed as a compromise between distributors and manufacturers.  H.B. 725 allows for the "termination, nonrenewal, or renewal of the franchise to a distributor of the acquired product of brand" if a "successor manufacturer acquires…all of the stock or assets of another manufacturer," so long as the successor repurchases inventory and compensates the distributor for diminished value of its business, and so long as the transaction does not fall within any of the prohibited conduct in §1333.85(B). Under §1333.85(D), if the successor follows the proper procedures, "just cause or consent of the distributor shall not be required for the termination or nonrenewal."

This evolution of the statute, as well as language allowing for either "termination" without just cause or "nonrenewal" without just cause, lends itself to the interpretation that

§ 1333.85(D) is an exception to the "just cause" requirement with compensation provisions—not merely a financial protection to distributors left without a franchise after a transaction—that allows the successor manufacturer to (1) "terminate" a franchise agreement, even if the franchise agreement carries over in the transaction, like it does in this case, or (2) not renew an agreement that does not carry over in the transaction, as in *Canandaigua*. This holding is in line with the holding in *Esber*, that §1333.85(D) clearly permits the termination of written contract agreements. Thus, the fact that the written Distribution Contracts persist after the CCR/KPS transaction is no bar to deeming CCR a "successor" and thus a "successor manufacturer."

### b.    Corporate Structure

Now that the Court has determined that the existence of the written contract is no bar to finding CCR is a "successor" within the meaning of "successor manufacturer," the court will address Plaintiffs' argument that because Labatt USA Operating's corporate structure has remained in place after the KPS/CCR Transaction, CCR cannot be a "successor" within the meaning of "successor manufacturer." The Ohio Appellate Court's ruling in *Esber* that an entity is a "successor" within the meaning of 1333.85(D) when it completely acquires a new manufacturer, product, or brand, even when the corporate structure of the prior owner essentially stays the same, evidences that CCR is a "successor" within the meaning of "successor manufacturer." *Esber* 2012-Ohio-1183 at ¶ 50.

The facts in *Esber* are directly applicable in this case. In *Esber*, when KPS purchased the Labatt brands, it formed Labatt USA Operating Company, L.L.C. as an indirect, wholly owned subsidiary of NAB, for the sole purpose of acquiring InBev's assets related to Labatt brands. *Id.* at ¶ 2-6. Thus, although the KPS/NAB transaction ultimately occurred at the operations-level, that operations-level purchase was a corporate formality—the actual funds for the purchase, and

the decision to make the purchase, came from the holding-company level, like CCR's purchase of all stock in Labatt USA Operating. Similar to this case, the distributors in *Esber* argued that there was no "successor," and §1333.85(D) was therefore not triggered, because Labatt USA Operating and Labatt USA appeared to be the same entities: Labatt USA Operating had the same franchise agreements, trade name, corporate structure, office address, warranties, etc., as Labatt USA. Thus, except for new ownership of its stock and relicensing, Labatt USA was the same entity as Labatt USA Operating. *Id*. at ¶ 46-49. The trial court ruled that §1333.85(D) was not triggered because the KPS/NAB/Labatt USA purchases appeared to be a "sham," holding it was more of a "restructuring" and renaming of business operations, with no products changing control. *Id.* The Appellate Court overturned the trial court's decision, and held that since "there was a transfer of ownership and control of the Labatt brands from InBev to Labatt USA Operating Co.," and there was "no evidence that InBev and Labatt USA Operating Co. are under common control," Labatt USA Operating was a successor manufacturer within the meaning of §1333.85(D). *Id.* at ¶ 50-51.

Like in *Esber*, it is undisputed in this case that KPS sold of all stock in NAB Holdings to CCR; and, like in *Esber*, because of this complete change in ownership, it is insignificant that Labatt USA Operating maintains mostly the same corporate structure before and after the KPS/CCR transaction. *Esber* clearly permits the termination of a written franchise agreement that is assumed during the acquisition of all of the stock of a manufacturer, brand, or product. Thus, Defendant's position that CCR is not a "successor manufacturer" because Labatt USA Operating did not change in form and maintained its franchise agreements under the KPS/CCR Transaction is unfounded under the logic in *Esber*. The *Esber* Court's ruling that §1333.85(D) permits a "window" of time in which a successor can terminate written contract, in addition to its

holding that a complete transfer of ownership of a brand, even when the corporate structure of the prior owner essentially stays the same, evidences that CCR is a "successor" within the meaning of "successor manufacturer."

### 2. Defining "manufacturer"

As the continuation of the Distribution Agreements and maintenance of Labatt USA Operating's corporate structure after the KPS/CCR Transaction are no bar in deeming CCR a "successor" within the meaning of "successor manufacturer," the Court now looks to Plaintiffs' argument that CCR does not fall within the definition of the term "manufacturer." The Ohio Appellate Court's decision in *Esber* clarified the definition of the term "manufacturer" as it applies to "successor manufacturer," and its definition applies in this case. In *Esber*, the Appellate Court addressed distributors' argument that Labatt USA Operating Co. was not a "manufacturer" at the time it acquired Labatt brands from InBev—as it was created only for the purpose of supplying the Labatt brands—and thus was not a "successor manufacturer" within a strict reading of the term "manufacturer." *Id.* at ¶ 45. The Court held that the term "successor manufacturer" should not be construed so strictly, because a strict reading would "lead[] to a conclusion that is illogical and could not have been the intent of the drafters." *Id.* The Court found that the drafters intended, instead, that the determination of whether the entity was a "successor manufacturer" depended on whether "the entity would be faced with making business decisions on how to operate most efficiently." *Id.*

The *Esber* Court held that the definition of manufacturer under §1333.82(B) incudes "one who manufactures or supplies alcoholic beverages to distributors in this state or is in the businesses of manufacturing or supplying alcoholic beverages to distributors in this state." *Id.* Stated differently, the *Esber* Court determined that the dispositive inquiry in determining

26

whether an entity was a "manufacturer" within the meaning of "successor manufacturer" was whether it was in the business of manufacturing or supplying alcoholic products or brands, and thus would be faced with making business decisions regarding how to operate most efficiently in the sale of products or brands.

In this case, Katherine Markert, manager of wholesaler development and regulatory compliance for Labatt USA Operating, gave uncontroverted testimony that CCR owns Labatt USA Operating and is faced with ultimate business making decisions concerning how Labatt USA Operating should operate most efficiently in supplying all brands that it has a right to supply. Transcript of May 28, 2013 Hearing (Doc. 72 at 155-210). Ms. Markert testified that CCR is faced with ultimate business making decisions in Labatt USA Operating's operations, and has taken tangible steps to demonstrate such authority: CCR hired a third-party consulting group to evaluate the commercial side of the business and to create 3-5 year plans; CCR placed an individual in the organization from CCR whose position is integration manager, and whose job it is to help lead the integration of Labatt USA Operating into CCR's culture and business goals and expectations; Labatt USA's management reports to management of CCR; Labatt USA Operating could not have issued the termination letters to Distributors without CCR's knowledge and approval; and, CCR has the power to change Labatt USA management if it chooses, direct Labatt USA to do business with a particular distributor, and approve or disapprove of marketing campaigns. *Id*. at 189-90, 194. Such testimony confirms that in addition to CCR's complete acquisition of Labatt USA Operating, it also is tasked with making ultimate business decisions concerning the operations of Labatt USA Operating. Thus, it is a "manufacturer" within the meaning of the term "successor manufacturer."

*3. Definition of the term "successor manufacturer"*

Considering the case law in *Esber* and the legislative history, this Court determines that Plaintiffs' efforts to disaggregate the term "successor manufacturer" misread §1333.85(D). Accordingly, this Court holds that the "successor manufacturer" is the entity which "acquires all or substantially all of the stock or assets of another manufacturer through merger or acquisition or acquires or is the assignee of a particular product or brand of alcoholic beverage from another manufacturer," and which, as a result of that acquisition of a manufacturer, product, or brand, is tasked with making business decisions on how to operate most efficiently in its newly acquired business of supplying or manufacturing alcoholic beverages. In this case, CCR, through its affiliate CCR Brewing, Inc., "acquire[d] all …. of the stock or assets" of NAB Holdings "through merger or acquisition," and ownership, therefore, over Labatt USA Operating.  As the owner of Labatt USA Operating, CCR is tasked with making business decisions about how to run Labatt USA Operating most efficiently. Under *Esber*'s definition of manufacturer, the particulars in licensing or ownership of every brand that Labatt USA Operating has a right to supply are not significant to the inquiry of whether CCR acquired Labatt USA Operating and has business-making authority over it.

Thus, CCR was a "successor manufacturer," entitled to terminate the written franchise agreements between Labatt Operating USA and Distributors that is assumed via the KPS/CCR Transaction within 90 days of the Transaction. Although CCR could terminate the statutorily-imposed franchise agreements without just cause because it is a new owner of a manufacturer, product or brand, it must compensate Distributors for the diminished value of their businesses that is directly related to the sale of the product or brand terminated, and must repurchase the Distributors' inventory of the terminated. This is the protection provided to Distributors under

the Act for terminations pursuant to the complete sale and acquisition of a manufacturer, product, or brand.

As, Labatt USA Operating belongs to CCR, and CCR oversees its operations, Labatt USA Operating is an appropriate entity to repurchase the inventory and take other actions necessary to effectuate the termination under the Act. This Court will hold a hearing at a later date to determine compensation due to Distributors.

## IV. CONCLUSION

Based on the foregoing, the Court finds Defendants' Motion for Partial Summary Judgment on Counts I and II is GRANTED, and Plaintiffs' Motion for Summary Judgment is DENIED.

**IT IS SO ORDERED.**

**s/Algenon L. Marbley**
**Algenon L. Marbley**
**United States District Court Judge**


**DATE: December 11, 2014**

29