**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **TRI COUNTY WHOLESALE** | : | |
| **DISTRIBUTORS, INC., et al.,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | **Case No. 2:13-CV-317** |
| **v.** | : | |
| | : | |
| **LABATT USA OPERATING CO., LLC,** | : | **JUDGE ALGENON L. MARBLEY** |
| **et al.,** | : | |
| | : | **Magistrate Judge Deavers** |
| **Defendants.** | : | |

**FINDINGS OF FACT AND CONCLUSION OF LAW**

**I.  INTRODUCTION**

Pursuant to Count IV of Plaintiffs' complaint, and Ohio's Alcoholic Beverage Franchise

Act, Ohio Revised Code § 1333.85-.851 ("Franchise Act" or "Act"), this Court is called upon to

establish the diminished value of the Plaintiffs' beer distributorships directly related to

Defendants' termination of Plaintiffs' distribution franchises of certain brands of beer. Plaintiffs

Tri County Wholesale Distributors, Inc. ("Tri County") and the Bellas Company d/b/a Iron City

Distributing ("Iron City") (collectively "Plaintiffs" or the "Distributors") are the exclusive

distributors of Labatt, Genesee, Seagram's Honey Brown, Dundee, Imperial and Dog Bite

("NAB Brands" or "Brands") in their respective territories. Labatt USA Operating Co. ("Labatt")

is the supplier of the NAB Brands; NAB Holdings, Inc. ("NAB") is a holding company parent of

Labatt; and Cerveceria Costa Rica, S.A. ("CCR") is a holding company parent of NAB

(collectively "Defendants").

1

In a letter dated February 27, 2013, CCR notified Iron City that its franchise for the distribution of NAB brands was being terminated pursuant to the "successor manufacturer" provision of O.R.C. §1333.85(D); Iron City received the letter on March 7, 2013. On March 11, 2013, Tri County received a similar letter, which was dated March 7, 2013. On April 4, 2013, Plaintiffs filed a complaint challenging the legality of the terminations of their franchises under O.R.C. §1333.85(D). After over a year of litigation, this Court granted summary judgment to Defendants, finding that the terminations of the franchises were proper. (Doc. 91).

From April 7-10, 2015, this Court convened a bench trial to determine the diminished value of the Plaintiffs' businesses. Following trial, parties submitted post-trial briefs including proposed findings of fact and conclusions of law. Pursuant to Fed. R. Civ. P. 52, this Court makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT

Plaintiffs called three witnesses to testify: Mr. Robert Chapman, C.P.A. and President of Iron City, Mr. Terry Patrick, Vice-President and Director of Tri County, and Co-Trustee of the Robert L. Lipton Irrevocable Trust, which owns the stock of Tri County, and Mr. Lamont Seckman, a beverage industry valuation expert. Defendants called one witness, Dr. Samuel Kursh, a beverage industry valuation expert.

### A.  Iron City - Robert Chapman

Robert Chapman is a C.P.A. and is the President of Iron City; he has worked for Iron City for over 35 years. Since March 2013, Iron City has continued to perform under its franchise agreement with Labatt. Chapman testified that if Iron City loses the NAB Brands, it would try to acquire new, smaller brands and grow them to replace the NAB Brands, a process which

2

Chapman predicts will take 5-10 years. Chapman opined that during that period, Iron City's per case cost to service its remaining brands would increase by $19,819 per year, for a total of $99,097 after five years. Iron City's only long term debt relates to a non-operating charge. Consequently, Iron City has no long term operating debt.

Chapman testified that he regularly uses a gross profit multiple approach to assess the value of a brand. When determining a brand multiple, Chapman considers the potential for growth of the brand and the relationship between the brand being purchased and the brands in Iron City's existing portfolio. In 2009, Iron City purchased the NAB Brands from Muxie Distributing Company at a multiple of 6x gross profits, and the agreement contemplated a buyback of the Brands at a multiple of 6x gross profits. Defendants approved of that 2009 sale. On March 27, 2015, Iron City entered into a Brand Purchase Agreement with Muxie Distributing Co. ("the Muxie Agreement"). Pursuant to the Muxie Agreement, Iron City agreed to sell the rights to distribute the NAB Brands to Muxie for a multiple of 6x gross profits. Iron City had learned of the sale of the NAB Brands during the 2014 calendar year. The Muxie Agreement also provided that the sale was contingent on Iron City's "receipt of a final judgment (from the U.S. Court of Appeals for the Sixth Circuit) holding that [Iron City's] Distribution Rights have been validly terminated pursuant to Revised Code 1333.85(D)."

Chapman testified that a 6x gross multiple is appropriate for valuing the NAB Brands because of their growth potential. He purchased them at a 6x gross multiple, and grew their sales from 500 cases to 2,000 in approximately six years.

3

### B.  Tri County - Terry Patrick

Terry Patrick is Vice-President and Director of Tri County, and Co-Trustee of the Robert L. Lipton Irrevocable Trust, which owns the stock of Tri County and several other businesses. Patrick testified that if Tri County lost the NAB Brands, Tri County would immediately sustain net operating losses. Tri County's 2012 Financial Statement shows that its "total comprehensive income" from all operations in 2012 was $240,239. That amount is comprised of gross profits ($3,185,415), operating expenses ($3,055,592), "other income" such as interest and the sale of property ($61,365), and other comprehensive income, such as unrealized holding gains ($48,251). Tri County has no long term debt.

In 2013, the NAB Brands accounted for 49% of the total number of case equivalents of beer sold by Tri County, but 42% of the gross profit for beer sold by Tri County. Tri County's gross profits on the NAB Brands in 2012 were $800,669, and the gross profits for the 12 months leading up to February 28, 2013 were $794,868. Patrick testified that because Tri County would incur operating losses without the NAB Brands, it had considered the possibility of liquidation. Instead, however, Tri County believes attempting to rebuild Tri County by purchasing and growing new brands is the strategy that will be in the best long-term interest of the company. He estimated that the rebuilding process would take 3-5 years, during which time Tri County would use $4 million in cash and securities to cover its operating losses.

In April 2014, Tri County entered into a Shared Services Agreement with R.L. Lipton Distributing, LLC ("Lipton"). Pursuant to that Agreement, Tri County subcontracted Lipton to provide all of Tri County's warehousing and delivery services, and Tri County pays a per case fee. For calendar year 2013, Tri County paid Lipton at a rate of about $1.39 per case equivalent.

4

Patrick testified that he negotiates brand values based on multiples of gross profits. Factors Patrick uses to determine an appropriate multiple include potential for brand growth and the profit contribution of a brand. Normally, transactions occur between multiples of 1 and 6 times gross profits, depending on the value of the brands and whether the transaction is voluntary or results from a termination by a manufacturer. On an annual basis, Tri County's independent valuators, Stout Risius Ross, use a gross profits multiple approach as one of a number of approaches to appraise the business. Although Stout Risius Ross could not identify comparable brand transactions, it determined that in the beer industry, brands usually transfer at 2 to 5 times gross profits multiple. To value Tri County's beer distribution rights, Stout Risius Ross used a multiple of 2.25 times the annual gross profits on all beer sales. No one from Stout Risius testified or explained why Stout Risus used this multiple, or which multiple would be assigned to the NAB Brands in particular.

Patrick testified that a multiple of 6-7x gross profits would be appropriate for the NAB Brands based on the volume and profitability of their sales, and the substantial contribution they provide in covering Tri County's operating costs.

### C. Plaintiffs' Expert – Lamont Seckman

Lamont Seckman testified on behalf of the Plaintiffs as to the diminished value of their beer distributorships. He has been involved in the beer industry since 1991, first as an employee and later as a principal within a consulting firm that works mostly with beer and beverage distributors across the country. Since 2001 he has owned a consulting company, in which he works with beer and beverage distributors representing buyers and sellers of brands in transactions.

To evaluate the diminished value of the Distributors' businesses as a result of losing the NAB Brands, Seckman used a discounted cash flow ("DCF") analysis, which measures the value of an asset according to the income it is expected to generate in the future, discounted to present value. Seckman applied the DCF analysis to the Distributors' businesses with the NAB Brands, and without, in order to arrive at a diminished value number.

In terms of avoided costs, Seckman calculated the Distributors' avoided costs from losing the Brands based on his analysis of what expenses could be reduced in four areas of the Distributors' operations: merchandising, sales, warehousing, and delivery. He determined that as of 2012, warehouse and delivery costs were largely fixed, except for some decrease in labor-related costs. If Iron City lost the Brands, Seckman calculated that its operating expenses for 2012 would be reduced by a total of $21,031. Seckman calculated that if Tri County lost the NAB Brands, its operating expenses for 2012 without the NAB Brands would be reduced by a total of $186,885, $73,090 of which is saved costs in warehousing and delivery.

In determining the discount rate as part of the DCF analysis, Seckman used a capital structure of 65% debt and 35% equity, which he testified was a typical capital structure of a buyer of a beer distributorship. His opinion was based on his experience in valuing beer distributorships and on the actual capital structure that he observed in transactions. Based on all of his assumptions, he determined that the appropriate discount rate for Iron City is 8.95%, and that the appropriate discount rate for Tri County with the NAB Brands is 9.2%, and without the brands is 10.15%.

He determined that the total decrease in the value of Iron City as a result of losing the NAB Brands was $646,000. For Tri County, Seckman calculated that the fair market value of Tri

County with the NAB Brands as of December 31, 2012 was $2,289,195, and the fair market value without it was negative $3,788,419. Thus he determined the total diminished value of Tri County would be $6,077,613.

### D.  Defendants' Expert- Dr. Samuel Kursh

Kursh has worked as a consultant for an economic and statistical consulting firm since 1985, providing analysis of damages in commercial matters, business valuations, and some statistics. He has provided valuations in the beverage industry since the early 1990s, and has performed a few hundred brand valuations in that time. He has a Doctorate in Business Administration, with a concentration in applied economics, and has taught "commercial damages" as a faculty member at Temple University Law School, as well as served as a faculty member at a number of other universities.

 Regarding a valuation of the diminished value of Distributors' businesses, Kursh testified that while he set out to value the entirety of the Distributors' businesses, based on the evidence produced in discovery and at trial, he found no demonstrated impact on the value of the Plaintiffs' other assets as a result of the loss of the NAB Brands.  As a result, he performed a DCF analysis to determine only the value of the Brands themselves.

In terms of avoided costs, Kursh assumed that the Shared Services Agreement was an appropriate proxy for Tri County's pre-termination warehouse and delivery expenses. Kursh calculated that Tri County's warehousing and delivery costs under the Shared Services agreement was $1.39 a case, and deducted 100% of those costs as avoided costs. As a result, he determined that avoided warehouse and delivery costs were $382,421, avoided sales commissions were $51,451, avoided Ohio tax costs were $8,379 and avoided merchandising

costs were $68,753. In terms of Iron City, however, he assumed that Iron City provided NAB products and its other products to the same customers, and so he did not calculate any avoided delivery costs. For Iron City, he calculated avoided warehouse labor costs and avoided sales expenses of $28,772, avoided merchandizing costs of $7,953, and avoided taxes. Based on the historical performance of both Tri County and Iron City, he made assumptions as to the future growth of the NAB Brands of both Distributors.

Kursh used two alternative capital structures to arrive at his discount rate. One was based on the capital structures of Tri County and Iron City, which both have 100% equity and 0% debt. He arrived at an alternative "long term industry capital structure" of 6.8% debt and 93.2% equity by analyzing data from the National Beer Wholesalers Association. Kursh testified that there is no publicly available report of discount rates used industry-wide. In fashioning his industry-wide rate, Kursh assumed that on average, brands would be valued across the entry county on a basis of a multiple of 2.5 times gross profit. Kursh acknowledged that in the popular press, transactions occur at multiples of 2x gross profits to 5x gross profits and are usually 3x gross profits or higher. There are not, however, any centralized databases of brand transactions. Kursh also testified that if a DCF analysis was performed and if the numbers were not similar to what was being observed in the marketplace, the DCF was probably incorrect, and that it was common among valuation experts to use other valuation approaches to test and reconcile values. Based on his assumption of 100% equity and 0% debt discount, Kursh arrived at a 25.16% discount rate. Based on his "long term industry capital structure" he arrived at a 23.71% discount rate.

He calculated that on a preliminary basis, Tri County's diminished value was $994,082 and Iron City's diminished value was $187,862.[1] Both of these valuations are as of the end of February 2013, coinciding with the date of the termination notice.  Further, Kursh testified that since Tri County has not yet transferred the NAB Brands, it has earned a post termination benefit for retaining the Brands after the termination date. He opined that allowing Tri County to retain their post-termination profits, while still compensating them for the Brands through the DCF valuation estimate, defies proper valuation practice and would lead to a windfall for the Plaintiffs. Thus, using actual monthly data of profits from March 2013 to January 31, 2015, he calculated that the post-termination benefit to Iron City is $53,983, and the post-termination benefit to Tri County is $270, 593. Adjusting for post-termination benefits, Kursh determined Iron City is entitled to $133,879, and Tri County is entitled to $723,489.

### E.  Conditions affecting beer distributorships

The evidence showed that multiples for brand transactions have been rising. It also showed that the increase in prices is due in part to consolidation among suppliers and distributors. As those industries have consolidated, the market of brands available for purchase has decreased; as a result, brand multiples have gone up. Mr. Chapman and Mr. Patrick testified to a number of transactions of higher multiples including: Iron City's purchase in 2009 of the Labatt brands from Muxie at a 6x gross profits multiple, Tri County's sale of Newcastle Brown Ale in 2008 to Beverage Distributors at a 5x gross profits multiple, Tri County's sale of Kenwood brand to Heidelberg at a 5.5.x gross profits multiple, and Bobby Fisher's purchase of Heineken from Hill Distributing at a 5.5x gross profits multiple.

---

[1] Kursh provided an initial Iron City report, and a rebuttal report, and for Tri County, he provided an initial report, a rebuttal report, and a third, subsequent report.  For the recalculation of the damages, the Special Masters used Exhibit D-13, for Iron City, and Exhibit D-54 for Tri County.

Evidence also showed that while market multiples have increased, manufacturers can exert influence and control in some transactions to depress multiples by exerting pressure on distributors to accept low multiples in exchange for retaining other lines of business, or to avoid litigation costs. For example, when Iron City acquired the Labatt brands from Muxie at a 6x gross profits multiple, it also acquired the same brands from Superior Beverage Company at a 2.5x gross profits multiple, a transaction in which Labatt dictated the price to buy from Superior.

Finally, Chapman, Patrick and Seckman all testified that high-volume, high-visibility brands, such as the NAB Brands, provide distributors with more opportunities to interface with customers and cross-sell the other brands, leading to synergies between brands. The witnesses acknowledged that this synergistic relationship is difficult to quantify.

### III. CONCLUSIONS OF LAW

In federal diversity actions, state law governs substantive issues and federal law governs procedural issues. *Bobby Fisher, Inc. v. Cervecería Costa Rica, S.A.*, No. 3:13-CV-196, 2014 WL 3845860, at *2 (S.D. Ohio Aug. 5, 2014) (citing *Erie R.R. Co. v. Tompkins,* 304 U.S. 64 (1938)). With a few minor exceptions, the Federal Rules of Evidence, rather than state evidentiary laws, apply in federal diversity proceedings. *Id*. (citing *Barnes v. Owens—Corning Fiberglas Corp.,* 201 F.3d 815, 829 (6th Cir.2000)); *Legg v. Chopra*, 286 F.3d 286, 290 (6th Cir. 2002) (same). The Sixth Circuit has stated that "[t]he admissibility of expert testimony is a matter of federal, rather than state, procedure." *Id*. (quoting *Brooks v. Am. Broad. Cos.,* 999 F.2d 167, 173 (6th Cir.1993)).

10

## A. Meaning of Diminished Value

The sole task before this Court is to determine the diminished value of the Distributors'
businesses directly related to loss of their franchises, pursuant to Ohio Revised Code §
1333.85(D), which reads:

> If the successor manufacturer complies with the provisions of this division, just
> cause or consent of the distributor shall not be required for the termination or
> nonrenewal. Upon termination or nonrenewal of a franchise pursuant to this
> division, the distributor shall sell and the successor manufacturer shall repurchase
> the distributor's inventory of the terminated or nonrenewed product or brand as set
> forth in division (C) of this section, and the successor manufacturer also shall
> compensate the distributor for the diminished value of the distributor's business
> that is directly related to the sale of the product or brand terminated or not
> renewed by the successor manufacturer. The value of the distributor's business
> that is directly related to the sale of the terminated or nonrenewed product or
> brand shall include, but shall not be limited to, the appraised market value of
> those assets of the distributor principally devoted to the sale of the terminated or
> nonrenewed product or brand and the goodwill associated with that product or
> brand.

Further, § 1333.851(B)(3) provides that if parties are unable to negotiate a diminished value
amount within 90 days of the termination date, then either party can bring a suit for judicial
determination of diminished value of the distributor's business. This is such a suit.

As is clear from its language, § 1333.85(D) does not: (1) prescribe a particular
methodology for determining "diminished value," (2) "define what is meant by the term
'diminished value,'" or (3) define "how expansive is the statutory opening to factors to which
our consideration 'shall not be limited.'" *Bobby Fisher*, 2014 WL 3845860, at *2. *Bobby Fischer*
is the only other case to have held a diminished value hearing under § 1333.85(D), but it made
no definitive holding regarding the proper meaning of "diminished value," or the proper
methodology for determining diminished value. *Id*. Instead, after considering the testimony of
the competing valuation experts, the Court determined that because the numbers the plaintiff's

11

expert utilized in his valuation model "were so speculative as to render the model of no use to the Court," the Court was left with no choice but to rely solely on the defendant's methodology. *Id*. at *3. The Court clarified that it accepted the plaintiff's methodology "not as the definitive manner of calculating the amount dictated by Ohio Revised Code § 1333.82, but as the only rational approach proposed to the Court in this case." *Id*.

Both parties concede that determining diminished value requires a determination of the value of the businesses before and after termination of the Brands. They also concede that under the language of the Act, the diminished value to Distributors' businesses directly related to the loss of the Brands shall include at least two discrete components—the appraised market value of those assets of the distributor principally devoted to the sale of the terminated brand, and the goodwill associated with that brand. Both parties further agree that the diminished value of the Distributors' businesses "shall not be limited to" those two discrete components, leaving the door open for Distributors to put on proof of other losses. Neither distributor possesses assets principally devoted to distribution of the NAB Brands. In terms of "goodwill," neither party provided a definition under Ohio law, but both appeared to assume that the value of the Brands themselves equaled their goodwill.

Parties disagree as to how to calculate diminished value in this particular case. Plaintiffs argue, that the "diminished value" in this case includes: (1) the value of the terminated Brands, including their goodwill; and (2) other diminution in value of the Distributor's businesses that relates to the terminated Brands, namely loss of synergies, and lost operating expenses. Thus, Plaintiffs' expert used a DCF, income-based analysis to value the businesses with and without the NAB Brands. Further, they argue that a gross profits multiple, market-based approach

reinforces their expert's DCF analyses, and supports a much higher valuation than Defendants' expert calculated.

Defendants' expert initially set out to value the entirety of the Distributors' businesses. Based on the evidence produced in discovery and at trial, however, he found no demonstrated impact on the value of the Plaintiffs' other assets as a result of the loss of the Brands. As a result, he performed a DCF analysis to determine only the value of the Brands. Further, he disagreed that a gross multiples approach could be applied as a check on the DCF value because there were not enough representative transactions with which to compare the Brands' values.

*JGR, Inc. v. Thomasville Furniture Indus., Inc.* is illustrative in explaining how to compute "loss of business value" damages and loss of "goodwill" damages. 830 F. Supp. 2d 358, 369-70 (N.D. Ohio 2011). Although *JGR* was a breach of contract case, and this case is a diminished business value determination stemming from a lawful franchise termination, *JGR* is useful because it defined "loss of business value." In *JGR*, the Court acknowledged that the "loss of business value is calculated by measuring the difference between the value of the business before the breach and the value of the business after the breach." *Id.* at 369 (citing *Taylor v. B. Heller & Co.,* 9 Ohio Misc. 104, 364 F.2d 608, 612 (6th Cir.1966) ("[t]he law of Ohio, which governs in this diversity action, recognizes the action for damages for destruction of a business as measured by the difference between the value of the business before and after the injury or destruction")).

In an earlier opinion in the same case, the *JGR* Court acknowledged two approaches for assessing "loss of business value." The first was a profit-based approach, in which "the value of the business can be determined by capitalizing at a fair rate of return, the average annual profits

(or net income) for a reasonable number of years." *JGR, Inc. v. Thomasville Furniture Indus., Inc.*, 748 F. Supp. 2d 746, 757 (N.D. Ohio 2010) *order clarified on reconsideration,* No. 1:96CV1780, 2011 WL 4396984 (N.D. Ohio Sept. 21, 2011) and *opinion vacated and superseded,* 830 F. Supp. 2d 358 (N.D. Ohio 2011) and *opinion vacated and superseded,* 830 F. Supp. 2d 358 (N.D. Ohio 2011) (citing *Bishop v. East Ohio Gas Co.,* 41 Ohio Law Abs. 353, at *7, 1943 WL 3194 (Ohio App. 8. 1943) and *Raybourn v. Buroker,* No. 82–CA61, 1983 WL 2552, *8 (Ohio App. 2. Nov. 22, 1983) (citing *Taylor v. B. Heller & Co.,* 364 F.2d 608 (6th Cir.1966) ("Since the value of a business depends mainly on the ordinary profits derived from it, the value of the business cannot be determined without showing what the usual profits are; the value of the business can then be determined by capitalizing at a fair rate of return the average annual profits for a reasonable number of years.")))). The capitalization of earnings methodology referenced in *JGR* is comparable to the DCF methodology that both experts used in this case; both methodologies are income-based approaches to valuation. *See Gallo v. Gallo*, 2015-Ohio-982, ¶¶ 25-27 (finding that the capitalization of earnings method, which uses a business's historical earnings, and the DCF method, which uses an equation to project future earnings over a chosen forecast period, are both income approaches to project future economic income associate with the investment, and their similarities "overshadow their differences").

The second approach is determining the fair market value, or "that price which would be agreed upon between a willing seller and a willing buyer in a voluntary sale on the open market." *Id*.; *see also Kapp v. Kapp*, 2005-Ohio-6830 (defining "'fair market value,' pursuant to Revenue Ruling 59–60, as 'the price at which an enterprise would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not

14

under any compulsion to sell, both parties having reasonable knowledge of all relevant facts").

The *JGR* Court expanded upon what would be encompassed in the fair market value of a furniture store, and provided a definition of goodwill:

> In establishing fair market value there are many elements to consider, including, but not limited to assets such as inventory, accounts payable, business furniture, equipment, fixtures, hardware, software, supplies and, perhaps, the value of real estate, if any. The fair market value of an entire business also "include[s] the goodwill and other intangibles" related to the business. *Campbell Hospitality, Inc. v. Shinn,* No. 02–CA–104, 2003 WL 22232650, *4 (Ohio App. 5. Sept. 25, 2003). "Goodwill" has been defined as "the advantage or benefit, which is acquired by an establishment, beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement, which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices." *Spayd v. Turner, Granzow & Hollenkamp,* 19 Ohio St.3d 55, 59–60, 482 N.E.2d 1232 (1985) (citation omitted). "A much narrower definition has been stated as the probability that the old customers will resort to the old place." *Id.* at 60, 482 N.E.2d 1232 (citing *Mattis v. Lally,* 138 Conn. 51, 54, 82 A.2d 155 (1951)). Some "intangibles" that *758 might contribute to the value of a business would include the value of a trade name and the value of contracts with other entities (e.g., other furniture suppliers with whom JGR had been doing business).

*Id.* at 757-58.

Thus, under *JGR*, fair market value includes a sum of the values of the component parts of a business, including goodwill. Goodwill is an intangible asset that represents the value a business derives from its reputation, which exceeds the value of its other tangible and intangible assets. Other "intangibles" which make up the fair market value of a business include the "value of contracts with other entities." *Id.* The value of the terminated franchises therefore, are a part of

the fair market value of the distributorship in their entirety, and it are distinct from the Brands' goodwill. [1]

Based on the evidence presented, and the procedure for determining diminished value in *JGR*, this Court takes a hybrid approach to determining diminished value: this Court finds that the diminished value to the Distributors' businesses is the fair market value of the franchise contracts, which is appropriately determined using a DCF analysis, plus any other loss in fair market value to other tangible or intangible components of the distributorships directly resulting from loss of the Brands.

Plaintiffs presented this Court with a DCF analysis of the Distributors' businesses with and without the Brands. In his report, Seckman stated that the DCF analysis represents the fair market value of the businesses with and without the Brands. [2] Seckman's more complex DCF analysis, however, was unnecessary under *JGR*, which explained that one arrives at the fair market value of a business by adding together the fair market values of the component tangible and intangible assets of a business, including the value of contracts. Consequently, rejecting Seckman's methodology of evaluating the entire businesses with and without the Brands is rendered irrelevant by the fact that the differences in value between the businesses before and after termination of the franchises are due, in their entirety, to lost profits from the terminated

---

[1] Both parties appear to claim that the "goodwill" associated with the Brands is equal to the value of the Brands. Neither party cites to supporting case law for this proposition, nor does it appear to comport with *JGR* and other Ohio case law.

[2] At trial, a lengthy back and forth ensued between experts concerning whether the Brands should be valued using a Fair Market Value approach, or whether they should be valued using an "investment value" approach, meaning an approach that considers the value of the Brands to the current distributors, rather than to a hypothetical distributor. This Court finds that such a distinction is mooted by Seckman's Report, in which he testifies that his DCF analysis "focuses on the subject business as an ongoing concern and on understanding the reasonably-expected economic returns to hypothetical owners of the ongoing concern and how such returns translate to a Fair Market Value as of a specific point in time."

franchises. Accordingly, in order to determine the total diminished value of both distributorships, this Court adopts the Defendants' method of using the DCF analysis to determine the fair market value of the Brands only, which this Court then will add to any other losses directly related to the loss of the Brands that the Plaintiffs establish. Such an analysis should yield the same results as Plaintiffs' unnecessarily abstruse DCF analysis of the entire businesses.[3]

Further, this Court agrees that "that the parties should be allowed to present evidence to the trial court regarding all factors impacting the diminution in value," during a § 1333.85(D) valuation. *BVT Lebanon Shopping Ctr., Ltd. v. Wal-Mart Stores, Inc.*, 48 S.W.3d 132, 135-36 (Tenn. 2001) (finding that a shopping center's loss of an anchor tenant affected not only income, but also stability of the center, attraction of customers, and other long-term financing, thus permitting presentation of evidence of any diminution in value due to breach of tenant's contract). Outside of establishing proof of the value of the Brands themselves, however, Plaintiffs failed to establish any other losses to the businesses directly related to loss of the Brands.[4] The only evidence of damage to the businesses that the Plaintiffs presented, aside from loss of the value of the Brands, is evidence of lost synergies between the NAB Brands and other brands the Plaintiffs own. Plaintiffs argue that "the unrebutted evidence showed that synergies between brands are a factor that affects the appropriate multiple of gross profits for a brand, and

---

[3] Defendants spend a significant amount of time criticizing Seckman for arriving at a negative fair market value of Tri County's business after the loss of the Brands. Such an argument is misplaced. As Plaintiffs explain, although the experts characterized their calculations differently and disagreed as to the amount of the negative value at issue, both ultimately included a component of negative value in their diminished value opinions. Because Seckman valued the entire businesses with and without the Brands, his negative value calculation is simply a quantification of losses Tri County would incur without the NAB Brands. This Court concludes that the estimate of losses is simply an abstract method for valuing these intangible, profit-generating assets of the franchises.

[4] Plaintiffs state in their brief that they not seek to recover any other losses directly related to termination of the franchises, including lost sales of other brands, because Plaintiffs' expert did not quantify any such losses.

that the high volume of the NAB brands provide synergies that allow a distributor to promote the sale of the other brands in his portfolio."

The Sixth Circuit has acknowledged in the context of the termination of a brand under 1333.85(D) that "the loss of a product which is unique . . . can cause a drop in customer goodwill." *Tri-Cnty. Wholesale Distributors, Inc. v. Wine Grp.*, *Inc.,* 565 F. App'x 477, 483 (6th Cir. 2012) (quotations and citations omitted) (finding that in the context of an injunction proceeding to enjoin termination of franchise agreements under 1333.85(D), goodwill is related to customer base and potential to sell product). Plaintiffs fail, however, to provide any concrete evidence of loss of goodwill or synergies related to the loss of the Brands, or to provide a financial estimate of the value of such lost synergies. Goodwill damages, which this Court concludes conceptually includes synergies, must be shown through competent evidence, and not through speculation. *See Gentek Bldg. Products, Inc. v. Sherwin-Williams Co.,* No. 1:02CV00013, 2005 WL 6778678, at *18 (N.D. Ohio Feb. 22, 2005). Thus, this Court is constrained it its ability to grant damages related to loss of goodwill or synergies in this case.

In sum, this Court finds that in this case the diminished value to the Distributors' businesses is the fair market value of the franchise contracts, which is appropriately determined using a DCF analysis. This Court's holding is in line with the holding in *Bobby Fisher*. As stated *supra*, the *Bobby Fisher* Court made no definitive holding regarding the proper meaning of "diminished value," or the proper methodology for determining diminished value; the Court did find, however, that a DCF analysis of the value of the terminated brands was an appropriate

18

means to arrive at the "diminished value" of the distributorship under § 1333.85(D).[5]

Three issues still remain: (1) which of the competing DCF analysis to adopt; (2) whether to accept the use of gross multiples—a market method—as an alternative valuation method; and, (3) whether to deduct profits earned after the termination date.

### B. DCF analysis

Both experts in this case utilized a discounted cash flow methodology, which:

> aims to estimate the net present value of a company. To do this, the analyst asks how much money would need to be invested today to equal the value of the estimated future net cash flow of the company (its projected revenues minus its projected costs, basically). A company's future cash flow must be discounted to equal its present value for two reasons. First, money today is worth more than money tomorrow. Second, the future cash flow is worth less than its nominal amount because it may not materialize-a going concern is, after all, a risky proposition. The DCF analyst, therefore, discounts the future cash flows to their present value using a statistic that combines these two discount rates: the weighted average cost of capital ("WACC"). Because future cash flows cannot be estimated for an infinite amount of time into the future, the analyst ordinarily projects the cash flows five or ten years into the future and then projects all remaining cash flows as a lump sum using a set value called a "perpetuity value."

*Sodhi v. Gentium S.p.A.*, No. 14-CV-287 JPO, 2015 WL 273724, at *5 (S.D.N.Y. Jan. 22, 2015); *see also Gallo v. Gallo*, 2015-Ohio-982, ¶¶ 25-27 ("The discounted cash flow method . . . uses an equation to project future annual earnings over a chosen forecast period…Unlike the direct capitalization of income approach, which assumes a perpetual stream of income, the discounted cash flow method uses a more complex equation to reduce a finite period of future income * * * to present valuation."). Thus, if the DCF methodology is applied appropriately, the values of the terminated franchises are equal to an estimate of lost profits the Distributors would have reaped from such contracts for some reasonable time into the future. This number should, theoretically,

---

[5] It is unclear from the *Bobby Fisher* opinion whether the Plaintiff put forth evidence of lost goodwill, lost use of assets principally devoted to the brands, or any other losses directly related to loss of the terminated brands, except for the lost value of the brands themselves.

fully compensate the Distributors for the diminished value of their businesses, and put them in the place they would have been, from a profit perspective, but for the termination of the contracts.[6] This is especially so because both Mr. Patrick and Mr. Chapman assumed around five years to rebuild their businesses after termination. It is for this reason that this Court declines to add onto the value of the lost franchise contracts any depletion of assets that Mr. Chapman and Mr. Patrick predicted would result from the termination of the franchises. Such theoretical losses are better viewed as lost profits, for which Distributors will be compensated fully through a DCF accounting of the Brands' values.

The experts agree that the DCF models they utilized are fairly similar, and that differing assumptions that they inputted into their models cause the chasm between their valuations of the NAB Brands. Specifically, Plaintiffs argue that the major differences between two assumptions are the primary culprits of the chasm: (1) differences in the avoided costs the experts inputted into their DCF models, and (2) differences in the capital structures the experts used to calculate the WACC.[7]

> As explained in *Bobby Fisher*:
>
> [u]nless the court performs its own appraisal-a task it is not inclined to undertake-the court must hold either for the plaintiff or the defendant, when often the truth-or at least a more exact picture of reality lies somewhere in between. *Id.* The Court, of course, may adjust an expert's appraisal up or down based on other experts' critiques of the appraisal, but the starting point for judicial determination

---

[6] It is partially for this reason that this Court rejects Plaintiffs effort to "reconcile" the diminished value to Distributors' businesses by adding a multiples-based valuation of the Brands to an estimation of depleted assets related to the loss of the Brands.

[7] In his rebuttal report, Seckman also disagrees with a number of Kursh's other assumptions. In their briefing, however, Plaintiffs only highlight these two major differences as the cause of the great divide between the two experts' valuations. For this reason, this Court will only address adjustment of the avoided costs, and the capital structure used to arrive at the WACC.

is always one appraisal or another, and each appraisal is based on a particular methodology that, to a large extent, predetermines the result. *Id.* at 551–52.

*Bobby Fisher,* 2014 WL 3845860, at *2 (citing *Union Pacific R. Co. v. State Tax Com'n of Utah,* 716 F. Supp. 543, 551 (D. Utah 1988)). Unlike in *Bobby Fisher*, this Court need not decide between two different methodologies. Instead, this Court must determine which experts' underlying assumptions that go into the DCF calculation are more persuasive and credible. *Hogan v. United States*, 407 F.3d 778, 782-83 (6th Cir. 2005) (finding district court did not err in adopting one appraisers estimate over the other because it found one appraiser to be more credible and persuasive). As this Court is not in the business of beer distributorship valuations, credibility determinations are guided, largely, by the competing experts' rebuttal analyses of the other experts' assumptions.

For a number of reasons, this Court finds Kursh's overall application of the DCF methodology more persuasive; but, this Court must adjust Kursh's DCF analysis to compensate for certain anomalies in his approach, which Plaintiffs brought to this Court's attention. First, as stated *supra*, Seckman's application of the DCF model to the entire businesses is contrary to this Court's hybrid approach to determining diminished value: that the diminished value to the Distributors' businesses is the fair market value of the franchise contracts, which is appropriately determined using a DCF analysis, plus any other loss in fair market value to other tangible or intangible components of the distributorships directly resulting from loss of the Brands. Seckman's valuation of the businesses in their entirety, therefore, adds unnecessary complexity to what is a much more straightforward determination.

Further, Seckman failed to explain his calculations and charts to this Court during trial, leaving this Court unable to ascertain fully his credibility, as well resulting in the unfortunate

consequence that his testimony was of little persuasive value. Kursh, on the other hand, reduced

his models to their component parts, and persuaded this Court as to their general credibility.

Additionally, other Courts, namely the *Bobby Fisher* Court, already have accepted Kursh's DCF

analyses as applied to the NAB Brands; this includes prior adoption of many of Kursh's

assumptions that he uses in this case.[8] Furthermore, Kursh's background further enhances his

credibility: he holds a doctorate in business administration and has taught "commercial damages"

as a faculty member at a law school, credentials which this Court finds particularly applicable to

the task at hand.

Lastly, Kursh used the proper valuation date in his DCF model, which is the date of the

termination notice. Section 1333.85(D) of the Act directs successor manufacturers, "upon

termination of a franchise" to compensate the distributor for the diminished value of the

distributor's business directly related to the loss of brands. Thus, the proper date from which to

determine the diminished value of the businesses is the date of termination. Seckman, in contrast,

used a number of end-of-year dates that are not directly applicable to the case *sub judice*.

In sum, Kursh's appraisal was "more credible and persuasive" than the testimony offered

by Seckman. *Hogan,* 407 F.3d at 782-83. In any event, whether the DCF analysis was applied to

the NAB Brands, or to the businesses before and after the loss of the Brands, both experts' DCF

analyses utilized nearly identical financial data—save some differences in valuation dates—to

arrive at a lost-profits number that approximates the value of the Brands. Thus, as Plaintiffs

---

[8] The *Bobby Fisher* Court accepted an industry growth rate of .55% a year, the same figure Kursh uses in this case, as well as an avoided tax rate of 34%, the same figure Kursh uses in this case. *Bobby Fisher,* 2014 WL 3845860, at *3. This Court adopts both figures as reasonable. The *Bobby Fisher* Court rejected Kursh's projected inflation rate of 1.50%, and adopted instead the Federal Reserve's current estimate of 1.83%. *Id.* at *4. When this Court asked Kursh at trial to argue for his 1.50% rate, he stated that 1.50% is the beer industry inflation rate, while 1.83% is the overall inflation rate. Thus, this Court adopts Kursh's 1.50% inflation rate.

argue, the stark difference in the experts' discount rates is primarily attributable to the capital structures the experts used in calculating the WACC, and their different valuations of avoided costs.

### 1. Capital Structure

In terms of the capital structure, Seckman used a capital structure of 65% debt and 35% equity, which he testified was a typical capital structure of a buyer of a beer distributorship. His opinion was based on his experience in valuing beer distributorships and on the actual capital structure that he observed in transactions.

Kursh, on the other hand, used two alternative capital structures. One was based on the actual capital structure of the two businesses, which were both 100% equity. The "alternative" capital structure was what he called a "long term industry capital structure" of 6.8% debt and 93.2% equity. While Dr. Kursh disagreed with Mr. Seckman's use of a buyer's capital structure, he acknowledged that the choice of a capital structure is one on which experts may reasonably disagree. Indeed, his preparation of a WACC based on the average industry capital structure is a concession that the proper choice of capital structure depends on the task at hand.

As Kursh conceded, the discount rate is the rate necessary to attract a third party purely financial investor qualified to make the investment. Because of that, it ordinarily would not be the practice to consider the seller's capital structure in determining the discount rate. He maintained, however, that when calculating the actual "diminished value" of the Distributor's businesses under the § 1333.85(D) standard, he believed the appropriate capital structure when determining the WACC is that of the seller; in contrast, when performing an overall valuation, he agreed one would tend to look at the industry capital structure.

This Court already has held, and all parties have testified that they agree, that when assessing the fair market value of the NAB Brands, this Court must strive to arrive at a value that would approximate the purchase and sale of the NAB Brands between a hypothetical buyer and a hypothetical seller on the open market. The Defendants, therefore, cannot have it both ways. They cannot maintain that the diminished value to the Plaintiffs' businesses is limited to the fair market value of the NAB Brands, and then argue that in this case, the discount rate used to estimate the value of the Brands should be based on the actual capital structure of the Distributors' businesses, and not on the average capital structure used between a hypothetical buyer and seller. Although the DCF analysis is based on a future projection of the Distributors' actual profits, it is actually a proxy for fair market value of the Brands. In order to compensate fully Distributors for the loss of the Brands, therefore, this Court must arrive at a value of the Brands that the Distributors would reap on the open market. Otherwise, Defendants would receive a windfall. Accordingly, this Court finds that the appropriate discount rate is one that uses the average industry capital structure.

Seckman based his estimated average industry capital structure on his personal experience in the industry, while Kursh based his on data from the National Beer Wholesalers Association. Neither expert presented the Court with foundational data or evidence showing how they arrived at their respective capital structures. This Court finds that both witnesses are qualified to produce estimations of the average capital structure used in the beer distribution industry, estimations on which this Court must rely. Accordingly, the most appropriate course of action is to average the two experts' estimated industry capital structures in order to arrive at a more representative discount rate. *See, e.g., Jackson v. Bd. of Assessment Appeals of*

*Cumberland Cnty.*, 950 A.2d 1081, 1087 (Pa. Commw. Ct. 2008) (holding that when the court is presented with testimony from competing experts regarding the value of property, and finds the testimony of both to be competent and credible, it is appropriate for the trial court to determine that the value lies somewhere between the values presented). Thus, the capital structure that will be used to determine the discount rate is 35.9% debt and 64.1% equity, an average of Seckman's 65% debt and 35% equity capital structure, and Kursh's 6.5% debt and 93.2% equity capital structure.

### 2. Avoided costs

Plaintiffs dispute Kursh's avoided cost figures, particularly Kursh's calculation of Tri County's avoided warehouse and delivery costs.

Kursh calculated Tri County's joint warehousing and delivery costs based on the Shared Services Agreement with Lipton, which was executed in April 2014.  He determined that under that Agreement, warehousing and delivery amounted to $1.39 a case. He testified that $1.39 a case was a fair and likely lower estimate of what Tri County's actual warehousing and delivery costs were in 2013, considering the Shared Services Agreement was negotiated at arms-length. He calculated based on the number of cases that the costs for warehousing and delivery totaled $382,421–and then he subtracted 100% of that as avoided cost.[9]

---

[9] In his report, Kursh states, "Tri County's financial document production lacked sufficient detail to develop robust estimates of warehouse and delivery costs as of the valuation date. However, effective September 2013, Tri County began purchasing warehouse and delivery services from an affiliate company, R.L. Lipton. Assuming the transaction to be arms-length and done in the economic interest of both parties, the contracted costs provide a reasonable basis for estimating Tri County's avoidable warehouse and delivery costs. For the period September through December 2013, R.L. Lipton was paid $300,825 to warehouse and deliver 18,745 CE of beer and 35, 588 CE of wine yielding a cost of $1.39 per CE. Exhibits 1 and 2 provide estimates of diminished value assuming avoided warehouse and delivery costs of $1.39 per CE."

In sum, he determined that Tri County's avoided costs for warehouse and delivery costs were $382,421, avoided sales commissions were $51,451, and avoided merchandising costs were $68,753. In terms of Iron City, however, he assumed that Iron City provided NAB products and its other products to the same customers, and so he did not calculate any avoided delivery costs. For Iron City, he calculated avoided warehouse labor costs and avoided sales expenses of $27,318, and avoided merchandizing costs of $7,953, for a total of $35,271.

Seckman, in contrast, determined that as of 2012 warehouse and delivery costs were largely fixed for both businesses, except for some decreases in labor-related costs. If Iron City lost the Brands, Seckman calculated that its operating expenses for 2012 would have been reduced by a total of $21,031. Seckman calculated that if Tri County lost the NAB Brands, its operating expenses for 2012 without the Brands would be reduced by $186,885, $73,090 of which is avoided warehousing and delivery costs.

Beginning with Iron City, this Court finds that both expert witnesses are qualified to produce estimations of the total avoided costs. Accordingly, the most appropriate course of action is to average the two experts' estimated avoided costs in order to arrive at a more representative amount of avoided costs. *See, e.g., Jackson*, 950 A.2d at 1087. Thus, by averaging $35,271, Kursh's estimate for total avoided costs for Iron City, and $21,031, Seckman's estimate for total avoided costs for Iron City, this Court arrives at total avoided costs of $28,151 for Iron City.

In terms of Tri County, this Court agrees that Kursh inappropriately deducted the full amount of warehousing and delivery costs based on the terms of the Shared Services Agreement, which prices warehouse and delivery costs on a per case basis. Defendants have argued since the

beginning of this matter that the appropriate valuation date is the date of termination. This Court agreed with that proposition. Accordingly, for valuation purposes, both parties are restricted to consider the conditions of the company at the termination date. Tri County entered into the Shared Services Agreement after the valuation date, and so the terms of that Agreement are of no concern this valuation. Thus, just as Kursh did not calculate any avoided delivery costs because he assumed that Iron City provided NAB products and its other products to the same customers, and thus that no delivery costs would be avoided post-termination of NAB Brands, this Court finds that Kursh incorrectly eliminated all delivery costs from Tri County's costs. Because Kursh subtracted the full amount of estimated warehousing and delivery costs, he did not estimate delivery and warehouse costs as separate figures. Accordingly, this Court is constrained to adopt Seckman's avoided warehousing and delivery costs, amounting to $73,090, as it is the only reliable figure available. Using Seckman's estimate of warehouse and delivery costs, Kursh's estimate of avoided Ohio taxes, and averaging the remaining avoided costs that both experts calculated for the same reasons as determined for Iron City, the average total avoided costs for Tri County are $197,964.[11]

### 3. Final Calculation

On May 27, 2015, pursuant to Fed. R. Civ. P. 53 and the inherent authority of the Court, and with the consent of both parties, this Court appointed Special Masters Professors Daniel Oglevee and Bill Rives to perform the computation of the Discounted Cash Flow analysis based on this Court's findings of fact and conclusions of law. (Doc. 131). This Court made clear in the Appointment Order that the Special Masters were to make no independent factual or legal

---

[11] Based on Exhibits D-54 and P-30: ($73,090 warehouse and delivery + $50,690 sales commission + $8,255 Ohio Tax + $68,753 merchandising = $200,788) + ($186,885 total avoided costs + $8,255 Ohio tax = $195,140)) / 2 = $197,964

findings. They were appointed to serve the limited purpose of entering numbers: specifically, this Court's updated industry capital structure and avoided costs, outlined *supra*, into a Discounted Cash Flow calculation, the basis of which was Dr. Kursh's model. The Special Master's report is attached hereto as Exhibit A, and made a part hereof.

In their report, the Special Masters detail how they reproduced Kursh's model and then entered this Court's updated capital structure and avoided costs to arrive at a new value of the Brands. For Iron City, the value of the Brands is $302,720. For Tri County, the value of the Brands is $2,757,459. This Court adopts these final determinations, pending any objections within 21 days of this Order to the Special Master's Report under Fed. R. Civ. P. 53(f)(2).

### C. Use of Gross Multiples

Plaintiffs argue that this Court should accept a valuation of the Brands based on a multiple of gross profits approach, otherwise known as a comparable transactions approach. Patrick and Chapman both testified that an appropriate multiple for the NAB Brands is 6x gross profits. Plaintiffs presented the following evidence of comparable transactions involving NAB Brands: following the KPS/CCR transactions in 2009, the Muxie sold the NAB Brands to Iron City at a multiple of 6x gross profits; in 2009, Superior purchased the Brands at a multiple of 2.5x gross profits; and, in the *Bobby Fisher* case, the judicial determination adopting the Defendant's expert's DCF analysis was the monetary equivalent of 2.5x gross profits.

Defendants argue that none of the above transactions is comparable, and thus cannot form the basis of a reliable gross multiples estimation. Kursh testified that the Muxie transaction is too small (gross profit of approximately $2,600) to be reliable, and the Superior transaction is too

old, thus leaving the *Bobby Fisher* case as the only reliable transaction. With only three transactions, however, this Court cannot assume statistical accuracy.

Defendants further contend that although industry participants frequently use multiples to value brands, this practice is essentially a short cut approach to calculating discounted cash flow. As both parties presented DCF analyses to value the Brands, Defendants assert that this Court need not rely on a gross multiples approach to valuation. Kursh concedes, however, that if a valuation expert performs a DCF analysis, and he or she does not arrive at numbers similar to those being observed in the market place, that indicates that the DCF analysis may be incorrect.

In fashioning his industry-wide WACC, Kursh assumed that on average, brands are valued across the county on a basis of a multiple of 2.5x gross profits. Kursh acknowledged that in the popular press, transactions occur at multiples of 2x to 5x and are usually 3x or higher. Further, on an annual basis, Tri County's independent valuators, Stout Risius Ross, valued Tri County's beer brands using a gross profit multiple value, and determined that beer brands yield an average gross multiple of 2 to 5.  To value the Tri County's distribution rights, Stout Risius Ross used an average multiple of 2.25 times the annual gross profits for all brands. Thus, the evidence both parties presented to this Court shows that some discrepancy exists between Kursh's DCF valuation, and the multiples of gross profit that beer brands normally yield.

This Court finds guidance in *Lane v. Cancer Treatment Centers of Am., Inc.*, a case that compared the merits of using a DCF approach to valuing a company, to the merits of using a comparable company and/or comparable transactions approach to valuing a company. No. CIV.A. 12207-NC, 2004 WL 1752847 (Del. Ch. July 30, 2004). *Lane* found that the utility of the comparable company and/or comparable transactions approach depends on the similarity

between the company the court is valuing and the companies used for comparison. *Id*. at 34. It concluded that when no precisely comparable company or transaction is identifiable, "at some point, the differences become so large that the use of the comparable company method becomes meaningless for valuation purposes." *Id*. The Court held, nonetheless, that when certain factors impair the Court's confidence in the DCF approach, "some input from a different methodology may yield a more accurate fair value," and held that the "the preferable approach is to perform a comparable company analysis and account for its shortcomings by giving it relatively minimal weight in relation to the result of the DCF process." *Id*.

Relying on *Lane*, this Court finds that the comparable transaction approach is unreliable in this case because none of the transactions presented to this Court is sufficiently comparable to the transaction at issue. That being said, Kursh's DCF analysis is clearly discordant with general market conditions; by his own testimony, multiples range from 2 to 5 times gross profits for all beer brands, but his DCF analysis was equivalent only to 1.21 times gross profits for Tri County, and 1.91- 2.1 for Iron City; at trial, there was no evidence presented at trial of a single transaction in which a beer brand sold for such low multiples. Thus, the collective testimony regarding gross multiples serves as a check on Kursh's DCF analysis, and shows that his analysis yielded brand values that are inappropriately low.

Unlike in *Lane*, however, where the Court assigned different weights to the results of the unreliable DCF approach and to the unreliable comparable company approach in order to arrive at a more representative outcome, this Court need not perform any weighing because this Court corrected the shortcomings in Kursh's DCF analysis with the assistance of the Special Masters, explained *supra*. The adjusted DCF analysis that this Court adopts is equivalent to 3.25 times

gross profits for Iron City, and 3.47 for Tri County, both figures within the industry average. Accordingly, Kursh's adjusted DCF analyses now better reflect the market rate for the NAB Brands.

### D. Deduction of Profits Earned after Termination Date

Plaintiffs argue that it would be incorrect for this Court to adopt Kursh's recommendation to deduct from the diminished value figure Distributors' profits earned on the sale of the NAB Brands after the termination date. Plaintiffs contend that no language in § 1333.85(D) authorizes such a deduction, nor does any precedent exist supporting such a deduction. Plaintiffs further aver that such a deduction would be inequitable in light of Distributors' continued performance under the written distributor agreement. Lastly, Plaintiffs argue such a deduction would result in a windfall to the Defendants, who would retain all of the profits they have earned from the franchises during the pendency of this suit.

Defendants retort that the language of the Act shows Plaintiffs' retention of post-termination profits, in addition to recovering the diminished value, would allow a windfall to Plaintiffs that is inconsistent with good valuation practice. This is because the diminished value compensation, calculated through the DCF methodology, theoretically already includes projected earnings for that very same period.

This Court finds that a deduction of post-termination benefits is improper. First, nothing in the Act directs this Court to deduct post-termination benefits. It is true that the Act anticipates a full transfer of the terminated Brands and payment of diminished value within 180 days of termination, a relatively short period of time, which may account for the Act's silence on the issue of post-termination benefits. *See* O.R.C. § 1333.851. By the same token, however, the Act

nowhere states that during those 180 days, not an insubstantial amount of time, distributors are not to retain profits earned.

Second, this Court is not persuaded by Defendants' argument that the projected revenue from the Brands from March 2013 to January 2015 is included in the diminished value figure, thus resulting in double recovery to the Plaintiffs if post-termination profits are not deducted. As Defendants testified on numerous occasions, the DCF analysis is one of a number of available methods to value, approximately, an intangible asset. Although the DCF method is based conceptually on projected future cash flows, it is not, in actuality, merely a representation of future cash flows, but is, instead, an estimate of the total value of the intangible asset. If this Court had found, for instance, that it would have been appropriate to value the Brands based on a market approach, Defendants would not have an argument to deduct future profits.

Third, just as Plaintiffs have benefitted from the franchises from March 2013 to January 2015, so have Defendants. By Defendants' argument, if Plaintiffs are to disgorge their profits, so should Defendants for the same period. What is more apparent is that both parties have benefitted financially from the status quo, and such post-termination benefits should not enter into this Court's calculus.

Finally, this Court senses hypocrisy in Defendants' request. On the one hand, they stand firmly by the principle that this Court must assess the value of the NAB Brands as of the date of termination. As such, this Court is prohibited from considering post-termination conditions or events. On the other hand, by their demand to deduct post-termination benefits, Defendants ask this Court to look to post-termination events. Further, rather than estimating post-termination profits based on the conditions of the businesses as of March 2013—which is the date from

which Defendants determine diminished value—Defendants ask this Court to deduct actual profits from March 13 through January 2015. This inconsistency, too, goes against deducting post-termination benefits.

In sum, this Court declines to deduct post-termination benefits.

### IV. CONCLUSION

Based on the foregoing, this Court determines that Plaintiff Tri County is entitled to a payment of $2,756,459 to compensate it for the diminished value of its business as a result of the loss of the NAB Brands, and Plaintiff Iron City is entitled to a payment of $302,720 to compensate it for the diminished value of its business as a result of the loss of the NAB Brands.

**IT IS SO ORDERED.**

       **s/ Algenon L. Marbley**
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**


**DATED:  June 24, 2015**